**OREGON NATURAL RESOURCES COUNCIL, et al., Plaintiffs,**

v.

**William M. DALEY, Secretary of Commerce; and Rolland A. Schmitten, Director, National Marine Fisheries Service, Defendants,**

v.

**STATE OF OREGON, Defendant–Intervenor.**

No. CV 97–1155–ST.

United States District Court, D. Oregon.

June 1, 1998.

---

Karl G. Anuta, Larry N. Sokol & Associates P.C., Portland, OR, Michael R. Sherwood, Claudia Polsky, Earthjustice Legal

Defense Fund, San Francisco, CA, for Plaintiffs.

Samuel D. Rauch, III, Washington, DC, for Federal Defendants.

Eric James Bloch, Portland, OR, for State Defendant–Intervenor.

## OPINION

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiffs, a group of environmental organizations, challenge the determination by defendants William M. Daley, the Secretary of Commerce, and Rolland A. Schmitten, the Director of the National Marine Fisheries Service ("NMFS"),[1] that the Oregon Coast evolutionarily significant unit of coho (silver) salmon (*Oncorhynchus kisutch*) ("Oregon Coast ESU") did not warrant listing as a threatened or endangered species under the Endangered Species Act ("ESA"), 16 USC §§ 1531–1544. 62 Fed Reg 24,588, 24,607–08 (May 6, 1997), (Exhibit 1).[2] This determination was based, among other reasons, on the expectation that the recently adopted Oregon Coastal Salmon Restoration Initiative ("OCS-RI") would reverse the decline of the Oregon Coast ESU.

This action was originally filed in the United States District Court for the Northern District of California (docket # 1) and was transferred to the District of Oregon on August 6, 1997 (docket # 128). The State of Oregon filed an unopposed motion for intervention (docket # 134), which this court granted on October 7, 1997 (docket # 137).

This court has federal question jurisdiction under 28 USC § 1331 and 16 USC § 1540(g). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Now before this court are the parties' cross-motions for summary judgment (dockets # 173, # 177, and # 182). For the reasons stated below, plaintiffs' motion is granted and defendants' motions are denied.

---

1. See Appendix for list of abbreviations used in this Opinion.

### *BACKGROUND*

### I. *The Endangered Species Act*

To analyze plaintiffs' challenge to the NMFS's decision not to list the Oregon Coast ESU as threatened, it is first necessary to understand the requirements of the ESA. In 1973, Congress enacted the ESA "to provide a program for the conservation of . . . endangered and threatened species." 16 USC § 1531(b). Congress charged the Secretary of the Interior with responsibility for listing decisions involving terrestrial species. The Secretary of the Interior in turn delegated his authority to the United States Fish and Wildlife Service ("FWS"). The Secretary of Commerce is responsible for listing decisions of ocean species and anadromous fish and has delegated that authority to the NMFS.

A non-insect species is "endangered" if the appropriate Secretary determines that the species is "in danger of extinction throughout all or a significant portion of its range[.]" 16 USC § 1532(6). A species is "threatened" if the appropriate Secretary determines that the species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 USC § 1532(20). Thus, a species is threatened if it is likely to qualify for endangered status within the foreseeable future.

Any interested person may petition to list a species as threatened or endangered. 16 USC § 1533(b)(3)(A). "To the maximum extent practicable, within 90 days after receiving the petition," the Secretary is required to make a finding "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* If the Secretary finds that the petitioned action may be warranted, he commences a status review of the species and, within 12 months of receiving the petition, must make a finding that (1) the listing is or is not warranted, or (2) at the present time the listing is warranted but precluded. 16 USC § 1533(b)(3)(B). If the Secretary finds that the listing is warranted, "a general notice and the complete text of a

---

2. All citations to exhibits are to the administrative record, unless otherwise noted.

proposed regulation to implement [the decision]" must be published in the *Federal Register*. 16 USC § 1533(b)(3)(B)(ii); *see also* 16 USC § 1533(b)(5)(A)(i) (general notice and text of the proposed regulation must be published not less than 90 days before the effective date of the regulation).

Within one year after publication of the proposed rule, the Secretary must make a final decision whether to place the species on the endangered or threatened species list. 16 USC § 1533(b)(6)(A). The one-year period runs from the date of publication of the proposed rule regardless of when the proposed rule was issued. *Oregon Natural Resources Council v. Kantor*, 99 F.3d 334, 339 (9th Cir.1996). The Secretary can invoke one six month extension if "there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination ... concerned." 16 USC § 1533(b)(6)(B)(i).

The ESA requires the Secretary to determine whether any species is endangered or threatened "because of any" of the following five factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) *other natural or manmade factors affecting its continued existence.*

16 USC § 1533(a)(1).

This determination is to be made:

solely on the basis of the best scientific and commercial data available to [the Secretary] after conducting a review of the status of the species and after taking into account those efforts, if any, being made

by a State or foreign nation ... to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction or on the high seas.

16 USC § 1533(b)(1)(A).

In addition, the Secretary is required to consult with the affected states when considering whether to add a species to the endangered or threatened species list. 16 USC § 1533(b)(5)(A)(ii).

## II. *History of Litigation*

On October 20, 1993, several organizations submitted a petition asking the Secretary of Commerce, acting through the NMFS, to add the west coast populations of coho salmon to the endangered or threatened species list. 62 Fed Reg at 24,589 (Exhibit 1). The NMFS subsequently identified six coho salmon evolutionarily significant units ("ESU")[3] that include populations in southern British Columbia, Washington, Oregon, and California.[4] The Oregon Coast ESU includes coho salmon from Oregon coastal drainages between Cape Blanco and the Columbia River. *Id.* It does not include the Rogue or the Klamath River basins. *Id.*

On June 1, 1995, plaintiffs filed a' Complaint seeking declaratory and injunctive relief in the Northern District of California (docket # 1). The Complaint alleged that defendants had violated § 1533(b)(3)(B) of the ESA by failing to act within one year after receipt of a petition to list west coast populations of coho salmon. Complaint, ¶¶ 31–33.

On July 25, 1995, the NMFS issued a proposed rule listing three coho salmon ESUs, including the Oregon Coast ESU, as endangered or threatened. 60 Fed Reg 38,-

---

3. The ESA defines "species" to include subspecies and any "distinct population segment of any species of vertebrate fish ... which interbreeds when mature." 16 USC § 1532(16). In 1991, the NMFS issued a policy stating that a Pacific salmonid population would be considered a distinct population segment if it represented an ESU of the biological species. 56 Fed Reg 58,-612 (Nov 20, 1991). To be considered an ESU, the population must be "substantially reproductively isolated from other conspecific population

units," and it must "represent an important component in the evolutionary legacy of the biological species." *Id.*

4. These six ESUs are as follows: the Puget Sound/Strait of Georgia ESU, the Olympic Peninsula ESU, the Lower Columbia River/Southwest Washington ESU, the Oregon Coast ESU, the Southern Oregon/Northern California ESU ("Transboundary ESU") and the Central California ESU. 60 Fed Reg at 38,016–18 (Exhibit 9).

011 (July 25, 1995) (Exhibit 9). Once the NMFS issued the proposed rule, defendants moved to dismiss the Complaint as moot (docket # 11). On September 15, 1995, the court ruled in favor of defendants, dismissing the original Complaint but granting leave to file an amended complaint (docket # 20).

On September 25, 1995, plaintiffs filed a First Amended Complaint (docket # 23), alleging in part that the Secretary was required to issue a final rule by October 20, 1995, which was two years after receipt of the petition by the NMFS. Defendants moved for summary judgment, arguing that the ESA allows issuance of the final rule within one year after the proposed rule, regardless of when the proposed rule was issued. The court ruled that the NMFS had violated the ESA by failing to publish its proposed rule by October 20, 1994, but that the final rule was due one year after the proposed rule was actually published. Order Granting in Part and Denying in Part Summary Judgment dated December 18, 1995 (docket # 45), *aff'd by Oregon Natural Resources Council v. Kantor*, 99 F.3d at 334. Thus, the final rule was due on July 25, 1996.

On July 23, 1996, the court extended the deadline for final action by the NMFS for three months to October 25, 1996, in light of a three-month moratorium on listing actions imposed by Congress. Order dated July 23, 1996 (docket # 95).

On October 31, 1996, the NMFS published in the *Federal Register* its final decision to list the Central California ESU as threatened. 61 Fed Reg 56,138 (Oct 31, 1996).[5] However, the NMFS determined that there was substantial disagreement as to the sufficiency or accuracy of the available data concerning the status of the Transboundary ESU and the Oregon Coast ESU. 61 Fed Reg 56,211 (Oct 31, 1996) (Exhibit 5). Accordingly, pursuant to § 1533(b)(6)(B)(i) of the ESA, the NMFS invoked a six month extension of the final deadline for these two ESUs in order to solicit additional information, thus extending the deadline to April 25, 1997.

On the final deadline of April 25, 1997, the NMFS issued its final rule listing the Transboundary ESU as a threatened species. 62 Fed Reg at 24,607-08 (Exhibit 1). However, the NMFS also determined that the Oregon Coast ESU did not warrant listing based in part on state conservation measures, such as the OCSRI. *Id*. The final rule was published in the *Federal Register* on May 6, 1997 with an effective date of June 5, 1997. *Id* at 24,588.

On May 1, 1997, defendants moved to dismiss plaintiffs' Amended Complaint (docket # 118). Plaintiffs responded by moving to again amend their complaint, alleging that further procedural violations existed and that the NMFS's reliance on the OCSRI was illegal (docket # 121).

The court granted defendants' motion in part and denied it in part. Order dated July 29, 1997 (docket # 128). The court first found that the NMFS was in full procedural compliance with the ESA after the April 25, 1997, listing decisions, and therefore, dismissed all claims relating to the Central California ESU and the Transboundary ESU. *Id* at 6-7. In addition, the court dismissed plaintiffs' procedural claim regarding the decision not to list the Oregon Coast ESU because plaintiffs had not complied with the required pre-suit notification procedures prior to bringing the claim. *Id* at 7-8. The court also held that the NMFS could rely on the OCSRI in determining whether or not to list the Oregon Coast ESU. *Id*. However, it found that the remaining issue of whether the OCSRI was adequate under the ESA could not be resolved without an extensive analysis of the administrative record, and that such a determination should properly be made by the District of Oregon rather than by the Northern District of California. *Id* at 9-11. Thus, this action was transferred to the District of Oregon.

On September 15, 1997, plaintiffs filed their Third Amended Complaint, which eliminated about 15 former plaintiffs and all claims relating to the Transboundary ESU and Central California ESU, and which fo-

---

5. Although the decision had been made on October 25, 1996, the *Federal Register* did not publish the decision until October 31, 1996.

cuses on one issue, namely, the legality of the NMFS's final determination not to list the Oregon Coast ESU as threatened.

## LEGAL STANDARDS

 Defendants' actions pursuant to the ESA are reviewed under the Administrative Procedure Act ("APA"), 5 USC § 706(2)(A), *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 980–81 (9th Cir.1985). Under the APA, the reviewing court must conduct a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). However, the standard of review is "highly deferential" and "presumes an agency's action to be valid." *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

A reviewing court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 USC § 706(2)(A). An agency's decision is arbitrary and capricious if it:

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's Inc. v. U.S. Consumer Prod. Safety Comm'n,* 92 F.3d 940, 942 (9th Cir.1996), quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Summary judgment is appropriate "[w]here agency action is challenged on the record as arbitrary, capricious, and in violation of procedures required by law." *Resources, Ltd., Inc. v. Robertson,* 789 F.Supp. 1529, 1534 (D.Mont.1991), *aff'd in part and rev'd in part,* 35 F.3d 1300 (9th Cir.1993), citing *Northern Spotted Owl v. Hodel,* 716 F.Supp. 479 (W.D.Wash.1988).

Review under the APA "is generally limited to the Administrative Record compiled in support of the decision being challenged." *Camp v. Pitts,* 411 U.S. 138, 141–42, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). However, the reviewing court may consider material outside the administrative record "(1) if necessary to determine whether the agency considered all relevant factors and has explained its decision, (2) when the agency relied on documents not in the record, or (3) when ... necessary to explain technical terms or complex subject matter." *Southwest Ctr. for Biological Diversity v. United States Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir.1996) (internal citations and quotations marks omitted). Both plaintiffs and defendant-intervenor State of Oregon have submitted extra-record affidavits. However, this court has disregarded these affidavits to the extent they provide information about events occurring after April 25, 1997, when the NMFS issued its final rule.

## UNDISPUTED FACTS[6]

### I. Status of West Coast Coho Salmon

#### A. Decline in Populations

During this century, indigenous, naturally reproducing populations of coho salmon "have been extirpated in nearly all Columbia River tributaries and they are in decline in numerous coastal streams throughout Washington, Oregon, and California." 62 Fed Reg at 24,588 (Exhibit 1). Natural coho runs in all six ESUs identified by the NMFS on the west coast "are substantially below historic levels." *Id.* For example, Oregon Coast ESU spawning escapements[7] dropped from an estimated 1.0–1.4 million fish in the early 1900s to between 16,500–37,688 fish in 1991–92. Exhibit 4, p. 63. However, after 1992, spawner numbers began to increase until they reached 78,343 fish in 1996. *Id.* According to the NMFS, "these numbers suggest that current abundance of coho salmon on the Oregon coast may be less than 5 percent

---

6. The following material is taken from the Concise Statements of Material Facts submitted by the parties in support of their respective summary judgment motions. However, as the federal defendants note, the "'no list" decision was based on the entire administrative record. These facts are key excerpts from that voluminous record.

7. "Escapements" are adult salmon leaving the ocean to return to their natal streams to spawn.

of that in the early part of this century." 60 Fed Reg at 38,021 (Exhibit 9).

## B. *Reasons for Decline*

This decline of coho salmon populations in California and Oregon "is the result of several long-standing, human-induced factors (*e.g.*, habitat degradation, harvest, water diversions, and artificial propagation) that serve to exacerbate the adverse effects of natural environmental variability from such factors as drought, floods, and poor ocean conditions." 62 Fed Reg at 24,592 (Exhibit 1).

One factor in the decline of the Oregon Coast ESU is the loss and degradation of the coho salmon's freshwater habitat due to the activities of humans. Activities responsible for the loss and degradation of coho salmon habitat in Oregon include "logging, road building, grazing and mining activities, urbanization, stream channelization, dams, wetland loss, beaver trapping, water withdrawals and unscreened diversions for irrigation." *Id.*

Forestry practices have degraded coho salmon habitat "through removal and disturbance of natural vegetation, disturbance and compaction of soils, construction of roads, and installation of culverts." *Id.* at 24,593. Timber harvest activities "can result in sediment delivered to streams through mass wasting and surface erosion that can elevate the level of fine sediments in spawning gravels and fill the substrate interstices inhabited by invertebrates." *Id.*

In addition, agricultural practices have "contributed to the degradation of salmonid habitat on the west coast through irrigation diversions, overgrazing in riparian areas, and compaction of soils in upland areas from livestock." *Id.* at 24,592.

Finally, the cumulative impacts of these various factors can be significant. "Although individual management activities by themselves may not cause significant harm to salmonid habitats, incrementally and collectively, they may degrade habitat and cause long-term declines in fish abundance." *Id.* at 24,593.

## C. *BRT Conclusions*

In response to the 1993 petition to list the west coast coho salmon, the NMFS formed the Biological Review Team ("BRT"), a team of 16 scientists, to review the scientific data and conduct a coast-wide status review of this species. On July 5, 1994, the BRT released a report reviewing the status of the coho salmon populations in Oregon entitled "Preliminary Conclusions of the Northwest Fisheries Service Center's Review of a Petition to List Oregon Populations of Coho Salmon Under the U.S. Endangered Species Act." Exhibit 10. The BRT concluded that the coho salmon populations in the Oregon Coast ESU "are severely depressed relative to historic levels" and ultimately "that a listing is warranted for this ESU." *Id.* at 1. However, the BRT did not consider the effectiveness of any existing or proposed conservation measures. Exhibit 12, p. 5.

Two months later on September 2, 1994, the BRT issued another report entitled "Conclusions of the Northwest Fisheries Science Center's Review of the Status of Coho Salmon From California, Oregon, and Washington." Exhibit 11. The BRT again noted the drastic decline in coho salmon populations within the Oregon Coast ESU and stated that the species "is likely to become endangered in the foreseeable future if present conditions continue." *Id.* at 2.

On July 26, 1995, in response to a petition to list the west coast coho salmon, the NMFS published a proposed rule in the *Federal Register* listing the Oregon Coast ESU as a threatened species under the ESA. 60 Fed Reg at 38,029–30 (Exhibit 9).

In September 1995, the BRT issued a 258–page status report, concluding that "coho salmon in [the Oregon Coast] ESU are not at immediate risk of extinction but are likely to become endangered in the future if present trends continue." Exhibit 12, p. vi, 128. The report explained that:

> The BRT reached this conclusion based on low recent abundance estimates that are 5–10% of historical abundance estimates, clearly downward long-term trends, recent spawner-to-spawner ratios that are below replacement, extensive habitat degradation, and widespread hatchery production

of coho salmon. Drought and current ocean conditions may have also reduced run sizes. *Id.* at vi–vii.

## II. *The Northwest Forest Plan*

Federal forest lands within the range of the Oregon Coast ESU are managed under the Northwest Forest Plan ("NFP"). The NFP was adopted by the Secretary of Interior and Agriculture on April 13, 1994, as Option 9 from the report by the Federal Ecosystem Management Team ("FEMAT").

According to the NMFS, the NFP contains measures, including the Aquatic Conservation Strategy ("ACS"), that significantly benefit coho salmon on federal lands. 62 Fed Reg at 24,596, 24,601–02 (Exhibit 1). However, "the overall effectiveness of the NFP in conserving Oregon and California coho salmon is limited by the extent of Federal land and the fact that Federal land ownership is not uniformly distributed in watersheds within the affected ESUs." *Id.* at 24,596. In the Oregon Coast ESU, "[f]ederal lands managed under the NFP comprise about 35 percent of the total area." *Id.* at 24,602.

## III. *OCSRI*

In response to the NMFS's proposal to list the Oregon Coast ESU, Oregon's Governor John Kitzhaber launched the OCSRI in October 1995. The OCSRI was modified following a public comment period and peer review by federal and non-federal scientists. 62 Fed Reg at 24,603 (Exhibit 1). The final version of the OCSRI was released on March 10, 1997. Exhibit 99.

The OCSRI contains four key tenets: "1) an ecosystem approach that requires a systematic consideration of the full range of attributes of aquatic health, 2) a focus on reversing factors for decline and meeting objectives that address those factors, 3) use of adaptive management and a comprehensive monitoring strategy, and 4) involving citizens and constituent groups into the restoration process." *Id.* at 2–1. The measures for addressing the factors for decline are broadly grouped into the following three categories: habitat measures, harvest measures, and hatchery measures. 62 Fed Reg at 24,-603–04 (Exhibit 1).

With respect to harvest measures in the OCSRI, Oregon decided to continue management actions that have decreased coho salmon harvest mortality from a peak of 90% in the 1970s–early 1980s to a current target exploitation rate of 7–12% (the actual mortality rate sometimes exceeds the target rate). Exhibit 99, p. 11–3. If substantial stock recovery occurs, the OCSRI would not allow increases in harvest unless ocean survival conditions improve. *Id.*

Hatchery measures are designed to reduce the amount of hatchery fish straying into wild populations. In some circumstances, hatchery fish can pose risks to the viability and genetic integrity of native salmon populations which might contribute to their risk of extinction or endangerment. 62 Fed Reg at 24,600 (Exhibit 1); Exhibit 11, p. 2. In 1994 the Oregon Fish and Wildlife Commission adopted the Wild Fish Management Policy that established guidelines to control the amount of hatchery fish straying into wild populations. However, the NMFS found that "full and prompt implementation of [the Wild Fish Management Policy] has not occurred." 62 Fed Reg at 24,598 (Exhibit 1). The OCSRI made additional changes to that policy to ensure that straying hatchery fish make up no more than 10% of the naturally spawning population. Exhibit 99 at ch. 17, § 4, p. 17B–19. In general, the overall number of hatchery releases has been drastically curtailed from the early 1980s, when hatchery releases peaked at over 23 million juvenile coho. *Id.* at 11–8. Releases in 1997 were only 3.47 million. *Id.* at 17B–20. According to the OCSRI, this number will be further reduced to 2.3 million by 1998. *Id.* In addition, Oregon has also begun marking all hatchery fish. *Id.* at 17B–21 to 17B–22.

Finally, with respect to habitat, the OCSRI contains numerous conservation measures that are designed to improve coho salmon habitat. Some of these had already been implemented, while others had not. *See generally id.* at ch. 17C, Parts I & II. Many measures are voluntary, such as the Watershed Councils. In addition, the OCSRI relies on a strategy of "adaptive management" and independent scientific peer review. *Id.* at ch. 7 & 13.

## IV. *March 28, 1997 BRT Status Review*

On March 28, 1997, the BRT issued an updated status review in which it evaluated the most recent data and information, excluding "the potential effects of numerous measures in the [Oregon] Plan that may influence freshwater habitat conditions." Exhibit 4, attachment. The BRT "evaluated extinction risk from two perspectives: 1) under the assumption that present conditions would continue into the future, and 2) assuming that hatchery and harvest reforms would be implemented as articulated in the OCSRI plan." *Id.* at 31.

Under the first assumption that present conditions would continue into the future, a majority of the BRT scientists concluded that the Oregon Coast ESU is "not at significant short-term risk of extinction," but is "likely to become endangered in the foreseeable future." *Id.* at 1, 35.

However, under the second assumption that the harvest and hatchery measures of the OCSRI would be fully implemented, the BRT was "about evenly split" as to whether those measures would "be substantial enough to move the ESU out of the 'likely to become endangered' category." *Id.* at 37. The BRT explained:

> The BRT generally agreed that implementation of the harvest and hatchery proposal would have a positive effect on the status of the ESU but the BRT was about evenly split as to whether the effects would be substantial enough to move the ESU out of the 'likely to be endangered' category. Some members felt that, in addition to the extinction buffer provided by the estimated 80,000 naturally produced spawners in 1996, the proposed reforms would promote higher escapements and alleviate genetic concerns enough that the ESU would not be at significant risk of extinction or endangerment....

*Id.*

The BRT concluded that "[w]hile harvest and hatchery reforms may substantially reduce short-term risk of extinction, habitat protection and restoration were viewed as key to ensuring long-term survival of the ESU...." *Id.* However, the BRT did not evaluate the freshwater habitat protection measures in the OCSRI. *Id.* at 35.

## V. *Memorandum of Agreement*

In April 1997, shortly before the court-ordered deadline for a final listing decision, the NMFS entered into a Memorandum of Agreement ("MOA") with Governor Kitzhaber. Exhibit 246. The MOA states that "[t]he NMFS has evaluated the OCSRI and believes that some portions will require adjustments early in implementation to ensure that Oregon coastal coho will be sustained, particularly with respect to habitat protection and restoration." *Id.,* § 7.

The MOA can be terminated unilaterally by either the NMFS or Oregon at any time "upon 30 days' notice in writing." *Id.,* § 12. Moreover, the NMFS's obligations under the MOA are conditioned upon "the availability of appropriated funds." *Id.*

With respect to forestry practices, the MOA states that "[t]he NMFS will work with Oregon and the Department of Forestry over the next six months to develop adjustments NMFS believes are required in Oregon forest practices to provide a high probability of protecting and restoring aquatic habitat on Oregon forest lands which are important for Oregon coastal coho." *Id.,* § 7(f)(1). The MOA then states that "Oregon shall make every effort to ensure that the Board of Forestry, or the Legislature consider the proposals promptly, and make a decision on the proposed changes in a timely manner and shall make any necessary changes no later than June 1, 1999." *Id.,* § 7(f)(3).

With respect to agricultural practices, the MOA states that Oregon is to "provide NMFS with information about standards and measures as they are developed" under Oregon's "Senate Bill 1010 program," *id.,* § 7(g)(1), so that the NMFS "may transmit recommendations to the Oregon Department of Agriculture ... in a timely manner." *Id.,* § 7(g)(2).

## VI. *NMFS Staff Recommendations*

On April 1, 1997, Hilda Diaz–Soltero, the Acting Director of NMFS's Office of Protected Resources ("OPR"), wrote to defendant Rolland Schmitten, advising him that NMFS's Northwest and Southwest Regional Directors were considering recommending

that the NMFS not list the Oregon Coast ESU in deference to the OCSRI. Exhibit 38. Ms. Diaz–Soltero expressed OPR's concern "about the biological, policy, and legal implications of" such a decision. She stated that "[i]f the [NMFS] follows these recommendations from the region[ ], it will be setting a bad precedent for future listing actions. NMFS is likely to lose a lawsuit if it follows the regions' likely recommendations because they will be difficult to defend in court." *Id.* at 1.

According to Ms. Diaz–Soltero "[t]he Administrative Record points clearly to the need to list ... the Oregon Coast ESU[ ] as threatened." *Id.* She also stated that "[t]he BRT's most recent conclusion [*see* Exhibit 4] should be taken as reason for caution. NMFS should err on the side of the conservation of the species and list it." *Id.* at 3.

The April 1, 1997 memorandum concluded by stating that the OPR "believes that it is unlikely that the [O]CSRI, even if implemented through an MOA, will be sufficient to change the status of coho salmon from 'threatened' to 'not warranted'," *id.*, and that:

In all of our conference calls, [the OPR] has heard nothing compelling, including harvest/hatchery provisions of Oregon's CSRI, that would cause it to recommend against listing the Oregon Coast ESU. This stock will not stabilize through harvest and hatchery measures. We must also address freshwater habitat, and to do that, we must list.

*Id.* at 4.

On April 14, 1997, Ms. Diaz–Soltero again wrote to defendant Schmitten recommending listing of the Oregon Coast ESU. Ms. Diaz Soltero stated that "[t]he habitat staff in Portland have made it clear that the OCSRI does not provide enough protection for coho salmon." Exhibit 40, p. 5. She concluded that:

The BRT's most recent conclusions are reason enough to list Oregon Coast coho salmon. In the face of uncertainty, NMFS must err on the side of the conservation of the species. The record supporting listing of this ESU is even stronger in light of the reviews described above. NMFS now has the opportunity to show that it is willing to follow the law, base its decision on the best available science, and protect the species.

*Id.*

Next, on April 24, 1997, Elizabeth Gaar, Director of the NMFS's Northwest Regional Habitat Conservation Program, transmitted to Jacqueline Wyland, Northwest Regional Protected Species Program Director, an 85–page analysis of the OCSRI's habitat protection measures, entitled "Coastal Coho Habitat Factors for Decline and Protective Efforts in Oregon." Exhibit 41. That memorandum evaluated and rated each of the OCSRI's habitat protection measures with respect to the 17 habitat factors for decline ("FFD") of the Oregon Coast ESU. The memorandum concluded that 11 FFD have a low likelihood of being reversed by OCSRI measures, six FFD have a moderate likelihood of being reversed, and no FFD has a high likelihood of being reversed. *Id.*, attachment, p. 2. Evaluating whether the "NMFS can determine today that the OCSRI will halt or reverse the downward habitat trend by addressing what NMFS has determined to be the factors for this habitat decline," it concluded that "[i]n many cases ... based upon what we can determine today, [the OCSRI] does not successfully achieve this goal." *Id.* at 1.

## VII. *The Final Rule*

The next day, on April 25, 1997, the NMFS withdrew its proposed rule issued 20 months earlier to list the Oregon Coast ESU as threatened, and instead determined that the Oregon Coast ESU is not threatened. 62 Fed Reg at 24,588, 24,607–08 (Exhibit 1). In its final rule published in the *Federal Register* on May 6, 1997, the NMFS summarized and responded to comments on five issues (*id.* at 24,589–92), summarized the five factors in 16 USC § 1533(a)(1) affecting coho salmon (*id.* at 24,592–602), and described the efforts to protect Oregon and California coho salmon, including federal conservation efforts (*id.* at 24,601–02), the OCSRI (*id.* at 24,602–605), the MOA (*id.* at 24,605–06), and California's conservation efforts (*id.* at 24,602–07). Referring to the BRT reports, the NFP, the OCSRI, and the MOA, the final rule con-

cludes that the Oregon Coast ESU "does not warrant listing at this time," explaining:

> The OCSRI contains the tools necessary to ensure that adequate habitat measures are ultimately adopted and implemented: a comprehensive monitoring program, scientific review, and an adaptive management program. Natural escapement has been increasing markedly in recent years and reached 80,000 fish in 1996. *On the basis of the harvest and hatchery improvements together with the habitat protections in the NFP and given the improving trends in escapement, the Oregon Coast Coho is not likely to become endangered in the interval between this decision and the adoption of improved habitat measures by the State of Oregon.* Under the April 1997 MOA between NMFS and the Governor of Oregon (MOA, 1997), described in the previous section, NMFS will propose to Oregon additional forest practices modifications necessary to provide adequate habitat conditions for coho. If these or other comparable protections are not adopted within 2 years, NMFS will act promptly to change the ESA status of this ESU to whatever extent may be warranted

*Id.* at 24,607–08 (emphasis added).

However, due to its heavy reliance on implementation of the OCSRI and MOA, the NMFS intends to review its determination in three years:

> Because the determination not to list the Oregon Coast ESU relies heavily on continued implementation of the OCSRI (in accordance with the MOA), including the enactment of improved habitat protective measures, NMFS intends to review this listing determination no later than the conclusion of 3 years (which represents one full life cycle and 3 year classes of coho salmon) or at any time sooner if substantive new information warrants consideration.

*Id.* at 24,608.

### DISCUSSION

Plaintiffs make numerous arguments that the NMFS's final determination not to list the Oregon Coast ESU as a threatened species violates the ESA. They contend that the federal defendants violated the ESA because:

(1) the Oregon Coast ESU is threatened or endangered as a matter of "biological fact" and therefore the NMFS had a non-discretionary duty to list the ESU; (2) the NMFS used an improper legal standard for determining whether the Oregon Coast ESU is threatened; (3) the NMFS did not base its decision upon the best scientific data available to it because that data supports a finding that the Oregon Coast ESU is threatened; (4) the NMFS improperly relied on the OCSRI, even taking into account the MOA, because the OCSRI is unimplemented, untested, and largely reliant on voluntary measures; and (5) the NMFS improperly relied on the NFP.

In addition, plaintiffs assert that the "no list" decision was arbitrary and capricious and thus violated the APA for the following reasons: (1) the NMFS relied on factors not intended by Congress; (2) the decision was contrary to the evidence before the NMFS and ignored or contradicted the conclusions, findings, advice, and recommendations of its staff; (3) the decision was inconsistent with the NMFS's previous decisions on the Central California Coast ESU, the Transboundary ESU, and other threatened salmonids in Oregon; and (4) the decision was based upon political concerns, rather than biological data.

Defendants deny plaintiffs' contentions and argue that the administrative record contains ample evidence that the final rule was reasonable in the face of conflicting scientific evidence.

As set forth below, this court concludes that the final rule is based upon an erroneous legal standard and therefore must be set aside. This court also finds that the explanation for the final rule is contrary to the evidence currently available to the NMFS and therefore was arbitrary and capricious.

### I. *NMFS Applied the Wrong Legal Standard*

■ The fatal flaw in the final rule is that the NMFS failed to use the proper legal standard for determining whether the Oregon Coast ESU is threatened. As already noted, a species is threatened if it is "likely to become an endangered species *within the*

*foreseeable future* throughout all or a significant portion of its range." 16 USC § 1532(20) (emphasis added). In concluding that the Oregon Coast ESU is not likely to become endangered, the final rule does not use the words "within the foreseeable future." Instead, it states that "the Oregon Coast coho is not likely to become endangered *in the interval between* this decision and the adoption of improved habitat measures by the State of Oregon." 62 Fed Reg at 24,607 (Exhibit 1) (emphasis added).

The ESA does not define the term "foreseeable future." As the appropriate definition for the "foreseeable future," plaintiffs urge this court to require the NMFS to analyze the survival chances of a species over the long term, possibly up to 100 years. The federal defendants disagree with plaintiffs' proposed length of time, but concede that a reasonable time frame for the "foreseeable future" in this case would be the one used in the NFP. That time frame is ten coho life cycles. Since each coho life cycle is three years, this means a total of 30 years.

This court need not decide whether the "foreseeable future" for coho salmon is 30 or 100 years because it is clear that the NMFS only determined that the Oregon Coast ESU would not become endangered within the next two years, falling far short of any reasonable definition of the "foreseeable future." The reference to "the adoption of improved habitat measures by the State of Oregon" means the possible amendments to the State of Oregon's forest practices regulations which may occur in 1999. In fact, the final rule says just that in the two sentences following its conclusion that listing is not warranted:

> Under the April 1997 MOA ... NMFS will propose to Oregon additional forest practices modifications necessary to provide adequate habitat conditions for coho. If these or other comparable protections are not adopted within 2 years, NMFS will act promptly to change the ESA status of this

ESU to whatever extent may be warranted.

*Id.* at 24,607–08.

Thus, the NMFS concluded only that the Oregon Coast ESU likely will not become endangered in the two years after issuance of the final rule in May 1997 while the State of Oregon attempts to provide adequate habitat protections. The NMFS reached no conclusion concerning endangerment in the foreseeable future. This omission is especially noteworthy since the final rule does refer to the foreseeable future when concluding that the Transboundary ESU warrants a listing as threatened.[8]

Defendants argue that this court may reasonably infer that the NMFS considered both the two years before Oregon's adoption of improved habitat measures, as well as the time period afterward. The NMFS may well have believed that the State of Oregon likely will adopt improved habitat measures, which will then protect the Oregon Coast ESU from becoming endangered within the foreseeable future. However, it did not so state in the final rule. Instead, the final rule expressly warns that "the habitat measures contained in the OCSRI *will not secure* adequate high quality habitat *over the long term* to ensure coho survival under a range of environmental conditions." *Id.* at 24,605 (emphasis added). After briefly mentioning the MOA, the final rule then explains that if the State of Oregon does not accept the guidance of the NMFS within two years, then the NMFS may change its mind and list the Oregon Coast ESU after all:

> Under the MOA, NMFS will provide the state of Oregon guidance on those specific measures it considers adequate and necessary for habitat protection. If these or equivalent measures are not adopted by Oregon within 2 years, NMFS will promptly change the ESA status of this ESU to the extent warranted. The MOA further commits the parties to full implementation of all elements of the OCSRI, including

---

8. "NMFS has determined that existing regulatory mechanisms over the ESU as a whole are either inadequate or not implemented well enough to conserve this ESU. While conservation efforts are underway for some populations in this ESU, particularly in the Oregon portion of the

ESU, they are not considered sufficient to reduce the risk that the ESU as a whole will become endangered *in the foreseeable future*. Accordingly, NMFS concludes that this ESU warrants listing as threatened." 62 Fed Reg at 24,608 (Exhibit 1) (emphasis added).

harvest and hatchery measures and provisions for monitoring and scientific review. *Id.* at 24,605–06.

◼ The ESA requires a determination as to the likelihood—rather than merely the prospect—that a species will not become endangered in the foreseeable future. In addition, as discussed below, that determination must be based on the current regulatory structure. It is not enough for the NMFS to merely hope that the Oregon Legislature will in fact adopt the requisite forest practices amendments within two years and hope that they may prove to be sufficient to protect the Oregon Coast ESU. Instead, the NMFS must determine, based upon a rational analysis of the factors set forth in the ESA, and in light of current regulatory measures, that the Oregon Coast ESU is not likely to become endangered in the foreseeable future.

It is incongruous for the NMFS to defer listing a species as "threatened" because the agency is hoping for a significant alteration in the conditions or practices presently threatening the long-term viability of the species, which in turn might prevent the species from actually reaching the "endangered" level. The whole purpose of listing species as "threatened" or "endangered" is not simply to memorialize species that are on the path to extinction, but also to compel those changes needed to save these species from extinction. By definition, a "threatened" species is one that is likely to become endangered in the foreseeable future *barring significant changes in the conditions or practices that are threatening the long-term viability of that species.* A listing decision is intended to cause those significant changes. Accordingly, if the Oregon ESU is likely to become endangered in the foreseeable future unless Oregon implements significant changes in its environmental laws and policies (and even then success is by no means assured), then by definition the Oregon ESU *is* presently a threatened species. At most, the OCSRI may prevent the Oregon Coast ESU from actually reaching the "endangered" level and may ultimately allow the NMFS to delist the species once recovery efforts are far enough along.

◼ The ESA contains very strict and nondiscretionary timelines and requires the Secretary to determine whether or not to list the species within one year after issuance of the proposed rule. The Secretary has no authority under the ESA to simply defer a listing decision for as long as he sees fit while waiting for some possible future event. Here, the final rule did no more than merely defer a decision on the Oregon Coast ESU for two years to allow the State of Oregon to perhaps take some action. If the NMFS determined that the Oregon Coast ESU likely will not become endangered in the foreseeable future, then it should have said so. Had it said so, the only issue in this case would be whether the administrative record rationally supports his decision. Instead, the final rule clearly indicates that the NMFS was concerned over the status of the Oregon Coast ESU and may reconsider its decision in a few years, but was unwilling to make the hard choice required by the ESA in April 1997.

Because the NMFS applied the wrong standard in the final rule, its decision violated the ESA and must be set aside and remanded to the NMFS for reconsideration.

## II. *The Final Rule is Arbitrary and Capricious*

Even if the NMFS had applied the correct legal standard, it acted arbitrarily and capriciously by relying on improper factors and offering an explanation for its decision that runs contrary to the administrative record. When issuing its proposed rule on July 26, 1995, the NMFS concluded that, based upon the currently available evidence, the Oregon Coast ESU should be listed as threatened. 60 Fed Reg at 38,029–30 (Exhibit 9). Yet 20 months later it reached the opposite conclusion. Although it is certainly permissible for the NMFS to change its position after considering public comments and soliciting additional data, the issue is why it changed its position with respect to the Oregon Coast ESU.

The final rule specifies the following reasons for the NMFS's "no list" decision: (1) "the harvest and hatchery improvements," (2) "the habitat protections in the NFP," and (3) "the improving escapement trend." 62 Fed Reg at 24,607 (Exhibit 1). In addition, the final rule specifically relies upon the

OCSRI, which contains harvest, hatchery, and habitat measures, and the MOA. However, when looking at the administrative record as a whole, none of these factors, alone or in combination, support the NMFS's decision not to list the Oregon Coast ESU.

This court must first determine what types of measures, *i.e.* regulatory versus voluntary, future versus present, and federal versus state, may be considered by the NMFS when it makes listing determinations. Next, the factors relied on by the NMFS in the final rule must be examined to determine whether they are the type of measures that the NMFS may legally rely on and whether they support the final rule.

### A. *The OCSRI*
#### 1. *Reliance on the OCSRI*

Plaintiffs argue that the NMFS violated the ESA by improperly relying on the OCS-RI to support its final rule. As a threshold issue, defendants argue that Judge Illston's July 29, 1997 Order precludes plaintiffs' argument *in toto* by ruling that the OCSRI was the type of plan that the NMFS should rely upon in making its decisions.

■ Judge Illston did hold that the NMFS could rely on the OCSRI when making its listing decision. However, she stated that the District of Oregon was the appropriate forum for determining whether the OCSRI met ESA standards. She did not analyze the OCSRI's numerous provisions but instead reserved that task for this court. Thus, plaintiffs are not foreclosed from arguing that the OCSRI's provisions are inadequate to support the NMFS's decision.

#### 2. *Future and Voluntary Measures*

Plaintiffs also argue that the OCSRI's provisions are generally unimplemented, future, voluntary actions which are insufficient to support a "no list" decision. Defendants counter that (1) the NMFS may properly consider future and voluntary state conservation efforts and (2) many of the OCSRI provisions are currently implemented.

As previously noted, one section of the ESA requires the Secretary to consider five factors in a listing decision; the fourth factor is "the adequacy of existing regulatory mechanisms." 16 USC § 1533(a)(1)(D). The next section of the ESA requires the Secretary to consider these five factors based upon the best available data "after taking into account those efforts, if any, being made by any State ... to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices." 16 USC § 1533(b)(1)(B). Plaintiffs argue that the two sections read together permit the Secretary to consider only state protective efforts that are regulatory and currently operational, and not state protective efforts that are voluntary in nature and rely on future action. Defendants respond that § 1533(b)(1)(B) does not state that state conservation efforts have to be existing, and only refers to protective measures, not regulatory measures. Thus, defendants conclude that the Secretary may consider state protective efforts even if they are to be taken in the future and rely on voluntary action.

The statutory reference to "existing regulatory mechanisms" in § 1533(a)(1)(D) is precise and unambiguous and, if standing alone, would preclude consideration of any future or voluntary conservation efforts which, by definition, are not "existing" or "regulatory." However, the language of § 1533(b)(1)(B) concerning "efforts" and "other conservation practices" is much broader and, if standing alone, would permit the Secretary to consider non-regulatory efforts. The question is whether § 1533(b)(1)(B) should be read merely to clarify what types of "existing regulatory mechanisms" may be considered as the fourth factor in § 1533(a)(1)(D) or whether it should be interpreted to expand upon the five factors by, in effect, adding yet another factor.

First, with respect to future actions, the answer is straightforward. Even the broad language of § 1533(b)(1)(B) cannot reasonably be interpreted to include future efforts, whether regulatory or non-regulatory. It speaks only in the present tense in terms of "efforts, if any, being made," and not future efforts which have yet to be made. The few courts that have addressed this issue have concluded that reliance on future actions is not permitted by the ESA.

The adequacy of future actions was first addressed in *Biodiversity Legal Found. v.*

*Babbitt,* 943 F.Supp. 23 (D.D.C.1996) and *Southwest Ctr. for Biological Diversity v. Babbitt,* 939 F.Supp. 49 (D.D.C.1996). Both cases involved "not warranted" listing decisions for species in Alaska, namely the Alexander Archipelago wolf and the Queen Charlotte goshawk, respectively. In its final rules, the FWS noted that the United States Forest Service's Tongass Land Management Plan could seriously affect the species. However, the FWS concluded that "recent proposals and actions by the Forest Service have or would modify historic management practices," benefitting both species enough to justify a "not warranted" decision. The court held that the FWS's decisions were arbitrary and capricious because "[i]n multiple places, the record makes reference to possible future actions of the Forest Service to provide sanctuary for the [species at issue]. Although the Secretary has every right to do this, he cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record." *Biodiversity Legal Found.,* 943 F.Supp. at 26; *Southwest Ctr. for Biological Diversity,* 939 F.Supp. at 52.

■ A case decided by this court, *Friends of Wild Swan, Inc. v. U.S. Fish and Wildlife,* 945 F.Supp. 1388 (D.Or.1996), concerned a "warranted but precluded" listing decision made by the FWS with respect to the bull trout. Under a "warranted but precluded" decision, the FWS must first determine that the species warrants ESA protection, and then whether listing is precluded because of ongoing listing determinations for species in greater peril. Thus, the court reviewed the FWS's determination that the bull trout faced only a "moderate" threat. In its final rule, the FWS pointed to the newly promulgated NFP. Judge Jones found the FWS's reliance on the NFP misplaced for several reasons. The relevant reason for this discussion is that the FWS "cannot rely upon its own speculations as to the future effects of another's agency's management plans to put off listing." *Id.* at 1398.

Finally, in *Save Our Springs Legal Defense Fund, Inc. v. Babbitt,* Civ No. 96–168–CA (W.D.Tex., Mar 25, 1997) (plaintiffs' Exhibit 4), the FWS determined that listing was not warranted for the Barton Springs salamander on the basis of a Conservation Agreement between the FWS and various Texas state regulatory agencies. Reviewing the provisions of the Conservation Agreement, the court found the FWS's decision arbitrary and capricious, noting that "[t]he effect of the measures that are articulated in the Conservation Agreement on the species is speculative. There are no assurances that the measures will be carried out, when they will be carried out, nor whether they will be effective in eliminating the threats to the species." *Id.* at 9.

■ This court finds persuasive the reasoning in these cases and similarly concludes that according to the plain language of the ESA, the Secretary may not rely on plans for future actions to reduce threats and protect a species as a basis for deciding that listing is not currently warranted. The NMFS may only consider conservation efforts that are currently operational, not those promised to be implemented in the future.

The more difficult issue is whether the ESA permits consideration of voluntary actions, as opposed to regulatory actions. Since the reference to "regulatory mechanisms" in § 1533(a)(1)(D) could easily include conservation efforts embodied in state regulations, it is difficult to understand why § 1533(b)(1)(B) specifically refers to "efforts" by states to "protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices." Such efforts could be regulatory and, hence, properly considered as "regulatory mechanisms" under § 1533(a)(1)(D). The parties have failed to shed any light on Congressional intent through the use of this language.

One case, *Natural Resources Defense Council v. U.S. Dep't of Interior,* 113 F.3d 1121, 1127 (9th Cir.1997), specifically addressed voluntary actions and held that "a purely voluntary [state] program that applies only to non-federal land-use activities" cannot be regarded as "a functional substitute for critical habitat designations." However, in that case the Secretary had already determined that the species warranted ESA protection and the disputed issue was the designation of critical habitat pursuant to the ESA. Thus, the case offers little guidance in this context of a listing decision.

Nevertheless, for the same reason that the Secretary may not rely on future actions, he should not be able to rely on unenforceable efforts. Absent some method of enforcing compliance, protection of a species can never be assured. Voluntary actions, like those planned in the future, are necessarily speculative. Although the federal defendants argue otherwise, this court notes that Michael Bancroft, Staff Attorney for the Department of Commerce's Northwest Region, stated in a memo to the NMFS Northwest Regional Director William Stelle that "[w]hen NMFS considers a state conservation program, it is worth mentioning the program's promotion of voluntary actions, for completeness in describing the program. However, NMFS should explicitly disclaim any reliance on the hoped-for benefits of voluntary actions in making its listing decision." Exhibit 40, attachment 3, p. 9. This court agrees with Mr. Bancroft.

Therefore, voluntary or future conservation efforts by a state should be given no weight in the listing decision. Instead, the NMFS must base its decision on current, enforceable measures. As discussed below, the final rule improperly relied on future and voluntary measures contained in the OCSRI.

## B. *The NFP*

The final rule also relies on the NFP. According to the NMFS, the NFP contains measures that will significantly benefit coho salmon on federal lands which comprise about 35% of the forest lands in the Oregon Coast ESU. 62 Fed Reg at 24,596 (Exhibit 1). In making the final decision not to list the Oregon Coast ESU as threatened, the NMFS stated that the NFP "will provide a high level of protection for coho habitat into the future." *Id.* at 24,607. Plaintiffs argue that the ESA forbids the NMFS from considering other federal agencies' conservation efforts in the listing decision.

Again, this court is called upon to interpret the fourth factor that the Secretary must consider when making a listing decision under the ESA, namely "the inadequacy of existing regulatory mechanisms." 16 USC § 1533(a)(1). That factor does not limit the source of "existing regulatory mechanisms" that may be considered. The NFP is an existing federal regulatory mechanism.

Thus, the question is whether the ESA precludes consideration of federal regulatory mechanisms such as the NFP.

This is not the first time that a court has been faced with the proper role of the NFP in the ESA. In a prior decision by this court, Judge Jones determined in *Friends of Wild Swan* that the Secretary's reliance on the NFP was arbitrary and capricious because it was not included in the administrative record. In addition, Judge Jones held that federal agency conservation efforts should not be taken into account in the listing decision, stating:

> The Act thus clearly indicates that federal protection of endangered and threatened species begins with the listing process, and it would be contrary to the purposes of the Act for FWS to allow the actions of one or two federal agencies, not required by the ESA, to deprive an otherwise warranted species of the broad protections the Act would require of all federal agencies if FWS completed the listing process.

*Friends of Wild Swan*, 945 F.Supp. at 1399.

However, *Friends of Wild Swan* appears not to have analyzed whether federal agency actions may be taken into account as "existing regulatory mechanisms" pursuant to § 1533(a)(1)(D). Instead, it refers specifically to § 1533(b)(1)(A), which provides that the Secretary may take "into account those efforts, if any, being made by any State or foreign nation. . . ." That section specifically includes only efforts by states or foreign nations and therefore necessarily excludes other federal efforts. In that regard, it is quite different than the language of § 1533(a)(1)(D). In addition, Judge Jones' conclusion is limited to the unique procedural posture of a "warranted but precluded" listing decision.

In contrast, other district courts have taken the position that federal conservation efforts are properly examined when making a listing determination. In *American Fisheries Soc'y v. Verity*, Civ No. 88–0174 (S.D.Cal. 1989), judgment vacated as moot by *American Fisheries Soc'y v. Mosbacher*, No. 89–15351, slip op. (9th Cir.1989), the court upheld the Secretary's decision not to list the winter-run chinook based on a conservation

agreement entered into by various state and federal agencies. The court noted that "[w]hen the activities of other federal agencies, as embodied in the [conservation agreement], are examined and their effectiveness assessed, most, if not all of the concerns raised about the threats to the species are addressed." *Id.* at 15. Although the Ninth Circuit vacated the district court's judgment, the analysis is still persuasive.

Next, in *Carlton v. Babbitt,* 900 F.Supp. 526 (D.D.C.1995), the court reviewed a decision that reclassification of the Selkirk Grizzly Bear population from threatened to endangered was not warranted. The court examined each listing factor. It concluded that the first factor—destruction, modification, or curtailment of habitat or range— was sufficiently addressed by the federal Interagency Grizzly Bear Guidelines. Thus, the court found that the Secretary can take into account federal agency regulatory efforts.

In both *Biodiversity Legal Found.,* 943 F.Supp. at 26, and *Southwest Ctr. for Biological Diversity,* 939 F.Supp. at 52, the court stated "if the Forest Service had an existing plan that would protect [the species] to the standards required by the ESA, then FWS would not have to enact its own plan."

Most recently in *Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Department of Interior,* Civ. No. 94–1058 (DNM Mar 20, 1998), the court reviewed the Secretary of the Interior's decision to list the Mexican Spotted Owl as a threatened species. Although not expressly stating that federal actions may be taken into account in the listing decision, the court cited both *Biodiversity Legal Found.* and *Southwest Ctr. for Biological Diversity,* and noted that "[a]ny informal plan utilized by the Forest Service could not provide the strict protection granted under the ESA. Thus, the USFWS properly found that no existing regulatory mechanism existed to protect the [Mexican Spotted Owl] and had grounds to list the species." *Id.* at 16. In other words, the court considered federal agency actions when analyzing the adequacy of the existing regulatory mechanisms and found them inadequate.

■ This court is persuaded that the NMFS may take into account other federal agencies' actions pursuant to § 1533(a)(1)(D). If current regulations, from whatever source, are sufficient to keep a species from becoming threatened, then it should be irrelevant that other federal agencies are not compelled to institute protective measures. If that species needs the full range of ESA protective measures to keep from becoming threatened or endangered, then the NMFS may list the species. Thus, the NMFS properly considered the NFP in its final rule with respect to the Oregon Coast ESU.

Having determined what types of measures the Secretary may properly consider in a listing decision, this court now turns to the specific measures relied upon by the NMFS in the final rule.

## C. *Adequacy of Habitat Measures*

The final rule specifically states that it is premised upon "the habitat protections in the NFP." In addition to the NFP, the final rule also references the OCSRI and the MOA which contain a number of habitat protections as well, many of which are future and voluntary. As discussed above, the ESA does not permit the NMFS to reply on future or voluntary actions as support for its decision. Thus, the critical issue is to what extent the final rule relies upon future and voluntary habitat measures.

Based upon the concerns of the BRT about the long-term risks to the Oregon Coast ESU from habitat degradation, even assuming that harvest and hatchery measures are fully implemented, habitat measures were critical to the listing decision. As summarized by the final rule:

Habitat degradation was one of the primary concerns of the BRT in evaluating long-term risks to this ESU. The BRT concluded that while the harvest and hatchery improvements may substantially reduce the short-term risk of extinction, habitat protection and restoration are *key* to ensuring the long-term survival of the ESU, especially under variable and unpredictable future climate conditions ... [T]he BRT [considers] risks from habitat loss

and degradation to be *relatively high* for this ESU.

62 Fed Reg at 24,607 (Exhibit 1) (emphasis added).

With respect to habitat management, the final rule relied in part upon the NFP, which, as explained above, is permissible. However, the crucial question is whether the NFP supports the decision not to list the Oregon Coast ESU as threatened. A viability panel established as part of the FEMAT process estimated an 80% likelihood that the measures in the NFP would be sufficient to allow coho salmon to stabilize on federal land. Exhibit 41, p. 38. The NMFS Habitat Conservation Program evaluated the NFP and found that many of the FFD of coho salmon have a high to moderate likelihood of being reversed on federal land. *Id* at 2. Thus, the administrative record supports the adequacy of the habitat measures in the NFP.

Nevertheless, as previously noted, federal lands comprise only 35% of the total land within the Oregon Coast ESU. 62 Fed Reg at 24,602 (Exhibit 1). Given the large quantity of habitat on non-federal lands, the NMFS concedes in the final rule that the effectiveness of the NFP is inherently limited:

> While the NFP covers a very large area, the overall effectiveness of the NFP in conserving Oregon and California coho salmon is limited by the extent of Federal lands and the fact that Federal land ownership is not uniformly distributed in watersheds within the affected ESUs. In some areas, Federal lands tend to be located in the upper reaches of watersheds or river basins, upstream of lower gradient river reaches that were historically important for coho salmon production. In other areas, particularly Bureau of Land Management (BLM) ownership, Federal lands are distributed in a checkerboard fashion, resulting in fragmented landscapes. Both of these Federal land distribution factors place constraints on the ability of the NFP to achieve its aquatic habitat restoration objectives at watershed and river basin scales and highlight the importance of complementary salmon habitat conserva-

tion measures on non-Federal lands within the subject ESUs.

*Id.* at 24,596.

Furthermore, the NFP was in existence in July 1995 when the NMFS issued its proposed rule that the Oregon Coast ESU should be listed as threatened. Yet the final rule does not provide any explanation why the habitat measures of the NFP supported a listing decision in 1995 but supported a contrary decision in 1997. An agency has an obligation to explain such a change in position. *See General Elec. Co. v. United States Dep't of Commerce,* 128 F.3d 767, 775 (D.C.Cir.1997) (remanding an agency regulation in part because the agency had not explained the rationale for the differences between the proposed rule and the final rule).

Although the NFP's habitat protections may be adequate for long-term survival of the species on federal lands, the NMFS concluded that they are insufficient absent adequate habitat protections on non-federal lands. Thus, it is difficult to conceive how the NFP alone offers an adequate basis to prevent listing of the Oregon Coast ESU as threatened.

The final rule also reviewed the Oregon Forest Practices Act ("OFPA"), finding that "while modified in 1995 and improved over the previous OFPA, [it] does not have implementing rules that adequately protect coho salmon habitat." *Id.* The NMFS also reviewed and found wanting federal and state removal and fill regulations, state and federal water quality programs, state agricultural practices, and state urban growth management. *Id.* at 24,596–97. Therefore, it turned to various federal and state conservation efforts.

The NMFS concluded that the Forest Service's land and resource management plan, as modified by the NFP and ACS, "will result in substantially improved habitat conditions for these ESUs over the next few decades and into the future" but again noted that they affected only 35% of the total area of the Oregon Coast ESU. *Id.* at 24,602.

It next reviewed the OCSRI habitat measures in some detail and concluded that:

The OCSRI's greatest contribution is that it provides a comprehensive framework for integrating habitat protection and restoration efforts by all entities, public and private. An important innovation is the emphasis upon voluntary citizen action, utilizing the industry and resource management expertise of local private property owners. Critical components of the OCSRI that should contribute to habitat restoration include watershed council program, monitoring, and adaptive management described below.

*Id.* at 24,604.

As described in the final rule, the OCSRI contains a high ratio of habitat measures that either were not yet implemented or were voluntary.[9] It described the Watershed Councils, noting that they "are voluntary groups established to improve the condition of the state's watershed" and "are currently in different stages in their development of watershed action plans." *Id.* It also noted that the monitoring program is not fully implemented. *Id.* at 24,605. In fact, the NMFS explicitly recognized that the habitat measures of the OCSRI are not currently adequate, although they might prove to be adequate in the future:

> Overall, however, the habitat measures of the OCSRI *do not currently provide* the protections NMFS considers essential to creating and maintaining the high quality habitat needed to sustain Oregon Coast coho over the long term across a range of environmental conditions. The OCSRI contains the tools necessary to ensure that adequate habitat measures are ultimately adopted and implemented

*Id.* at 24,607 (emphasis added).

This is very faint praise for the OCSRI. Even the tools in the OCSRI for ensuring future habitat protection did not provide a high level of assurance to the NMFS. As stated in the April 24, 1997, memorandum by Ms. Gaar which evaluated the OCSRI's habitat protection measures, the OCSRI "does not successfully achieve this goal" of halting or reversing the downward habitat trend. Exhibit 41 attachment, p. 1.

Therefore, the NMFS entered into the MOA with Governor Kitzhaber. 62 Fed Reg at 24,605 (Exhibit 1). However, as already noted, the problem of future and voluntary action extends to the entire MOA, which not only requires future action by the State of Oregon, but also can be terminated by either party with 30 days notice. Although the NMFS has no incentive to terminate the MOA, Oregon might. If the political winds change, and Governor Kitzhaber is replaced by a governor who does not support the OCSRI or MOA, nothing would prevent Oregon from terminating the MOA and not adopting improved habitat measures.

The final rule itself admits that "the determination not to list the Oregon Coast ESU relies heavily on continued implementation of the OCSRI (in accordance with the MOA), including the enactment of improved habitat measures." *Id.* at 24,608. Thus, the final rule is premised upon promises of future, as well as voluntary actions, the ability of which to protect and restore the Oregon Coast ESU is necessarily speculative and uncertain. This court declines to tie the fate of the Oregon Coast ESU to the whim of politics and promises of future state conservation actions that may be years or decades away from implementation.

Indeed, the NMFS has elsewhere explicitly acknowledged that it should not defer a listing based upon such promises. In its final rule listing the Central California Coast ESU as threatened, it stated: "NMFS cannot defer a listing based on the prospect of future developments of conservation measures." 61 Fed Reg at 56,104.

In addition, just a few months earlier, the NMFS had listed as threatened the Umpqua River cutthroat trout, another salmon species

---

9. "On state lands, the Oregon Department of Forestry is preparing a Northwest Oregon State Forest Management Plan ... On private forested lands, ... [t]he OCSRI also provides some additional voluntary measures on the part of industrial forest landowners and small woodland owners that focus on OCSRI core areas.... On agricultural lands, the State of Oregon addresses coho salmon habitat protection and restoration through the 1993 Senate Bill (SB 1010) (ORS 568.900–933) and its extension, the Healthy Streams Partnership (HSP)." 62 Fed Reg at 24,603 (Exhibit 1.) The record does not indicate that any SB 1010 plans had been designed and implemented at the time of the final rule.

within the same geographic area, notwithstanding the fact that Oregon includes that species in the OCSRI. 62 Fed Reg 41,514 (Aug 9, 1996). As NMFS Northwest Regional Director William Stelle stated in his July 30, 1996 letter to Governor Kitzhaber: "The fact that the [O]CSRI is still taking shape did not allow us to decline to list Umpqua cutthroat trout at this juncture." Exhibit 125, p. 2. No explanation is given by the NMFS for not listing the Oregon Coast ESU in deference to the OCSRI while at the same time listing the Umpqua River cutthroat trout.

Moreover, with respect to the Transboundary ESU, the NMFS found that California's Watershed Initiative was deficient because "no funding past the current fiscal cycle is proposed and landowner participation in the program is voluntary." 62 Fed Reg at 24,606 (Exhibit 1). Similarly, OCSRI's habitat measures are largely voluntary. Yet unlike California's Watershed Initiative, the NMFS appears to accept Oregon's voluntary measures as adequate without explaining how they differ from the California measures.

Even more telling are the recommendations of the OPR, as encompassed by Ms. Diaz–Soltero's letters, that the habitat measures are insufficient to support a "no list" decision. While this court declines plaintiffs' invitation to delve into the structure of the NMFS and determine to which staff members the Secretary should defer regarding ESA matters, the memoranda highlight the dissatisfaction with the OCSRI among NMFS staff members. Indeed, the administrative record is replete with documents from the NMFS that are critical of the OCSRI. Although this factor alone does not render the NMFS's decision arbitrary and capricious, it serves to cast doubt on the legitimacy of its reasons for failing to list the Oregon Coast ESU as threatened.

However laudable Oregon's efforts to employ new management techniques to try to restore the Oregon Coast ESU, such future, voluntary conservation efforts cannot be a legal substitute for listing. There is simply no rational basis for the NMFS to assume that Oregon will adopt any, much less adequate, habitat measures Further, at this point the NMFS cannot possibly judge the effectiveness of any voluntary measures that Oregon does implement because they have not been tested. In short, whether the OCSRI's and MOA's habitat measures can succeed over the long term is currently unknown and unknowable. Any rational listing decision requires the testing of conservation measures to determine their effectiveness in protecting a species. Should the OCSRI ultimately achieve the results its proponents predict, the Oregon Coast ESU may be delisted. See 16 USC § 1533(c)(2)(B).

In summary, it was arbitrary and capricious for the NMFS to rely on future, voluntary and untested habitat measures premised upon an admittedly inadequate OCSRI and an MOA that can be terminated with 30 days notice.

### D. Adequacy of Harvest and Hatchery Measures

Regardless of the adequacy of habitat measures, defendants argue that the NMFS's decision was reasonable due to the harvest and hatchery measures. They note that the BRT was evenly split as to whether full implementation of the harvest and hatchery measures would be sufficient to move the Oregon Coast ESU out of the threatened category and that most of the harvest and hatchery measures are already implemented. Thus, they conclude that based on the conflicting scientific evidence, the NMFS could reasonably decide not to list the Oregon Coast ESU as threatened.

This court accepts the proposition that in the event of a scientific disagreement between experts, the Secretary is free to rely on the expert opinion of his choice. *See Central Arizona Water Conservation Dist. v. U.S. Environmental Protection Agency,* 990 F.2d 1531, 1539 (9th Cir.), *cert. denied,* 510 U.S. 828, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993) (an agency is entitled to considerable deference in the face of uncertain technical information). Nonetheless, defendants' argument fails for two reasons.

First, even though many of the harvest reforms have already been implemented, their future is uncertain. The harvest measures contained in the OCSRI are "only a 4–year (1997–2000) interim proposal, and [have]

no guarantee beyond 2000." Exhibit 4, attachment, p. 29. The MOA was implemented partly as a response to concern that these measures would not continue past the year 2000. In the MOA, Oregon commits to continue the harvest measures beyond 2000 unless the NMFS approves any proposed changes. Exhibit 246, § 7(k)(1). However, the ability of Oregon to terminate the MOA with 30 days notice hardly constitutes a reasonable assurance that the measures will continue.

Second, the opinion by half of the BRT that the OCSRI's harvest and hatchery measures were sufficient to move the Oregon Coast ESU out of the threatened category was premised on full implementation of the harvest and hatchery measures. However, an overarching "strong concern" of the BRT was "[u]ncertainty regarding the true extent of hatchery influence on natural populations." Exhibit 4, attachment, p. 34. In the final rule, the NMFS itself cautions that while Oregon's Wild Fish Management Policy, adopted in 1994, has improved hatchery operations in Oregon, "full and prompt implementation of the policy has not occurred." 62 Fed Reg at 24,598 (Exhibit 1). In any event, many of the hatchery measures were already in place by July 1995 when the NMFS issued its proposed rule listing the Oregon Coast ESU as threatened. The final rule fails to explain what happened after July 1995 that turned the hatchery measures into a basis to not list the Oregon Coast ESU.

In fact, the final rule in general appears to be very pessimistic regarding the status of the Oregon Coast ESU. It accepts the conclusions regarding the general decline of the Oregon Coast ESU, emphasizes the importance of habitat measures, and finds the OSCRI to be inadequate. Thus, to say that the NMFS merely resolved a conflict between conflicting conclusions of BRT scientists is disingenuous at best.

### E. *Adequacy of Improving Escapement Trend*

As the final factor in its decision not to list the Oregon Coast ESU as threatened, the NMFS points to the improving escapement trend. However, in response to comments concerning the status of the Oregon Coast

ESU, the NMFS expressed the following reservation in that area:

> Although escapement has been increasing for the ESU as a whole ... recruitment and recruit's-to-spawner ratios have remained low. While recent natural escapement has been estimated to be on the order of 50,000 fish per year in this ESU (reaching approximately 80,000 fish in 1996), this has been coincident with drastic reductions in harvest. Prefishery recruitment was higher in 1996 than in either 1994 or 1995, but it still exhibits a relatively flat trend since 1990.

> \* \* \* \* \* \*

> In contrast to most of the 1980s, spawner-to-spawner ratios in this ESU have remained at or above replacement since 1990 (due primarily to sharp reduction in harvest.). This represents the longest period of sustained replacement observed in the past 20 years. It is notable that this sustained replacement has occurred during a period of low recruitment and primarily poor-to-fair ocean conditions. *However, significant concerns remain regarding the declining trend in this ESU's productivity.*

*Id.* at 24,591 (emphasis added).

According to the BRT, the escapement data merely indicated a short-term fluctuation and did "not change the overall pattern of decline" in the ESU. Exhibit 4, Attachment, pp. 20–21, 33. Thus, as the final rule makes quite clear, the escapement trend alone fails to justify a decision not to list the Oregon Coast ESU. To the contrary, the NMFS expressed "significant concerns" about the "declining trend" in productivity. Therefore, the harvest, hatchery, and habitat factors become critical and, as discussed above, do not provide a rational basis to support the final rule.

### CONCLUSION

The NMFS's ultimate conclusion not to list the Oregon Coast ESU flies in the face of its express concerns regarding the OCSRI. The wait-and-see stance of the NMFS has no support in the ESA or case law. Instead of placing the risk on the future and voluntary

conservation measures proposed by the OCS-RI, the NMFS unlawfully placed the risk of failure squarely on the species. Thus, this court finds the NMFS's final rule regarding the Oregon Coast ESU was arbitrary and capricious and remands this matter back to the NMFS for further consideration consistent with this Opinion.

## APPENDIX
### LIST OF ABBREVIATIONS

| | |
|---|---|
| ACS: | Aquatic Conservation Strategy (contained in the NFP) |
| APA: | Administrative Procedures Act |
| BRT: | Biological Review Team (team of 16 scientists) established by NMFS |
| ESA: | Endangered Species Act |
| ESU: | Evolutionarily Significant Unit |
| FEMAT: | Federal Ecosystem Management Team |
| FFD: | Factor for decline |
| FWS: | U.S. Fish and Wildlife Service |
| MOA: | 4/34/97 Memorandum of Agreement between NMFS and State of Oregon |
| NFP: | Northwest Forest Plan |
| NMFS: | National Marine Fisheries Service |
| NOAA: | National Oceanic and Atmospheric Agency (NMFS's parent agency) |
| OCSRI: | Oregon Coastal Salmon Restoration Initiative Plan |
| OFPA: | Oregon Forest Practices Act |
| OPR: | NMFS's Office of Protected Resources |
| Oregon Coast ESU: | Oregon Coast evolutionarily significant unit of coho (silver) salmon (*Oncorhynchus kisutch*) |