ROCKY MOUNTAIN WILD, Center for Biological Diversity, Utah Native Plant Society, Southern Utah Wilderness Alliance, Grand Canyon Trust, Western Resource Advocates, and Western Watersheds Project, Plaintiffs,

v.

Noreen WALSH, Regional Director of the Mountain–Prairie Region of the U.S. Fish and Wildlife Service, Sally Jewell, Secretary of the Interior, U.S. Fish and Wildlife Service, and U.S. Department of the Interior, Defendants,

and

State of Utah, Utah School and Institutional Trust Lands Administration (Sitla), and Uintah County, Utah, Intervenor–Defendants.

Civil Action No. 15–cv–0615–WJM

United States District Court, D. Colorado.

Signed 10/25/2016

Christopher Douglass Eaton, Robin L. Cooley, Earthjustice Legal Defense Fund, Denver, CO, for Plaintiffs.

Alison C. Finnegan, U.S. Department of Justice, Travis James Annatoyn, Washington, DC, for Defendants.

Erin Kelly Murphy, Kathleen C. Schroder, Davis Graham & Stubbs, LLP, Denver, CO, for Intervenor-Defendants.

## ORDER VACATING ADMINISTRATIVE ACTION AND REQUIRING MEET–AND–CONFER BETWEEN THE PARTIES

William J. Martínez, United States District Judge

In this lawsuit, various conservation organizations ("Plaintiffs") challenge a decision by the United States Fish and Wildlife Service ("FWS") not to list two flowers as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* (ECF No. 1.) Those flowers are the Graham's beardtongue (*Penstemon grahamii*) and White River

beardtongue (*P. scariosus* var. *albifluvis*) (together, "beardtongues"). These beardtongues are endemic to eastern Utah and northwestern Colorado, and are allegedly put at risk by oil and gas development.

FWS chose not to list the beardtongues based on a 15–year conservation agreement that FWS had just entered into with other governmental entities ("Conservation Agreement" or "Agreement"). The Conservation Agreement requires the signatories to implement restrictions on federal, state, and private land. These restrictions will ostensibly protect the beardtongues from the decline that might otherwise result from planned development. Plaintiffs, however, believe that FWS is legally precluded from considering the Conservation Agreement in its listing decision, given that it was new and unproven at the time FWS made its decision not to list the beardtongues. Plaintiffs alternatively argue that the Conservation Agreement's provisions do not go far enough, and so FWS's decision not to list the beardtongues based on the Conservation Agreement's protections was arbitrary and capricious.

For the reasons explained in detail below, the Court finds as follows: FWS is not legally precluded from accounting for new conservation agreements when assessing the status of a potentially threatened or endangered species. Thus, FWS did not err when it accounted for the Conservation Agreement in this case, nor did it err in concluding that the Conservation Agreement's provisions were likely to be carried out. Nonetheless, FWS acted contrary to the ESA by: (1) concluding that yet–to–be-enacted regulatory and non-regulatory measures mandated by the Conservation Agreement were "existing regulatory mechanisms"; (2) failing to account for the Agreement's expiration when determining whether the beardtongues face material threats in the "foreseeable future"; and (3) taking into account economic consider-

ations when imposing a 300–foot buffer zone around each beardtongue. Plaintiffs challenge additional aspects of the Conservation Agreement, but the Court finds that those aspects are inseparably linked to the size of the buffer zone. Therefore, the Court can make no ruling on them until FWS reconsiders the buffer zone.

The Court will vacate FWS's decision not to list the beardtongues. However, before entering final judgment and remanding this matter to FWS, the Court will require the parties to meet in person and discuss whether the Conservation Agreement may be modified in a manner satisfactory to Plaintiffs.

## I. STATUTORY FRAMEWORK

■ The ESA is intended to prevent the extinction of species that FWS determines to be "endangered" or "threatened." "Endangered" means the species is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). "Threatened" means the species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

Section 4 of the ESA (16 U.S.C. § 1533) permits private parties to petition FWS to add a particular species to FWS's formal list of threatened and endangered species. *Id.* § 1533(b)(3)(A). FWS is then directed to make a preliminary finding within 90 days. *Id.* Assuming it finds "substantial information indicating that the petitioned action may be warranted," FWS has 12 months to issue either a "not warranted" finding (thus rejecting the petition) or a proposed regulation adding the species to either the endangered or threatened list. *Id.* § 1533(b)(3)(B). If FWS proposes to list the species under either category, it then has 12 more months to make a final decision. *Id.* § 1533(b)(6)(A).

When making listing determinations, the ESA requires FWS to determine "whether any species is an endangered species or a threatened species because of " five enumerated factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1) (emphasis added). In evaluating these factors, FWS must make its listing determinations

solely on the basis of the best scientific and commercial data available to [FWS] after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

## II. BACKGROUND

### A. The Beardtongues

The Graham's beardtongue is a flowering plant endemic to exposed oil shale strata in portions of the Uinta Basin, particularly in Uintah County, Utah, but also in Rio Blanco County, Colorado. 78 Fed. Reg. 47590, 47591–95 (Aug. 6, 2013). The White River beardtongue is a flowering plant endemic to the same region, although in a smaller geographic area that partially overlaps with the Graham's beardtongue habitat. *Id.* at 47595–97.

### B. Previous Listing Decisions Regarding the Graham's Beardtongue

The Graham's beardtongue was brought to FWS's attention in 1975, when FWS accepted a Smithsonian Institution report that included it in a list of potentially endangered species. *See* 71 Fed. Reg. 3158, 3158 (Jan. 19, 2006). However, FWS did not receive a formal listing petition specific to the Graham's beardtongue until some of the Plaintiffs here filed such a petition in 2002. *See id.* at 3159.

FWS's failure to act on that petition led to litigation and a settlement requiring it to make a listing decision by January 2006, which it did. In that decision, FWS found that advances in hydrocarbon extraction technologies increased the likelihood that energy companies would begin mining and extracting precisely in the oil-shale-rich range of the Graham's beardtongue. *Id.* at 3161–63. FWS therefore concluded that "[h]abitat destruction and degradation as a consequence of energy development throughout the species' range pose a serious threat to long-term viability," and therefore proposed that the Graham's beardtongue should be listed as "threatened." *Id.* at 3164.

In December 2006, however, FWS withdrew its proposal. *See* 71 Fed. Reg. 76024. FWS concluded that the threat of oil and gas development "ha[d] been adequately addressed and mitigated by BLM [*i.e.*, Bureau of Land Management] policies, land use planning, and on-the-ground protective measures," and that "there is great uncertainty over the technological and economic viability of commercial production, and, therefore, over timing and eventual location of oil-shale extraction." *Id.* at 76035.

### C. The 2007 Draft Conservation Agreement

In 2007, FWS and BLM began negotiating a conservation agreement with the

Utah Department of Natural Resources, the Utah School and Institutional Trust Lands Administration (SITLA),[1] and Uintah County. *See* 79 Fed. Reg. 46042, 46042–43 (Aug. 6, 2014) (summarizing the 2007 draft agreement). This agreement was never signed by all parties and was "only partially implemented." *Id.* at 46042. It appears that its main accomplishment was to prompt the parties to fund and conduct surveys of the beardtongues between 2007 and 2010. *Id.* at 46042–43.

### D. The 2008 Lawsuit

In late 2008, some of the same Plaintiffs here filed a lawsuit in this Court, challenging FWS's December 2006 decision to withdraw its listing proposal. (*See Center for Native Ecosystems et al. v. United States Fish & Wildlife Service et al.*, No. 08–cv–2744 (D. Colo., filed Dec. 16, 2008).) Finding that FWS had not properly considered or explained its withdrawal decision, this Court (per District Judge Walker D. Miller) eventually vacated that decision, reinstated the proposed listing, and directed FWS to reconsider whether to make the proposed listing final. *See Ctr. For Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 795 F.Supp.2d 1199, 1210 (D. Colo. 2011) ("*CNE*").

### E. The 2013 Proposed Listing

In August 2013, FWS issued a new proposed listing, this time proposing to classify both the Graham's beardtongue and the White River beardtongue as threatened ("2013 Proposed Listing"). *See* 78 Fed. Reg. 47590 (Aug. 6, 2013). FWS justified this proposal primarily on the same grounds offered in its January 2006 proposal, *i.e.*, likely oil and gas development

on the very types of soils in which the beardtongues grow. *See id.* at 47598–602.

### F. The 2014 Conservation Agreement

Following FWS's 2013 Proposed Listing, the parties to the proposed 2007 conservation agreement reconvened, along with certain others. 79 Fed. Reg. 46042, 46043. For the next year, they negotiated the Conservation Agreement at issue in this lawsuit. The Conservation Agreement is dated July 22, 2014, and is signed by authorized representatives of FWS, BLM, SITLA, the Utah Division of Wildlife Resources, the Utah Public Lands Policy Coordination Office, Uintah County, and Rio Blanco County. (Administrative Record ("R.") at 4999–5005.)

The Conservation Agreement designates 44,373 acres of the beardtongues' habitat as "conservation areas." (R. at 5024.) About 38,500 of those acres are controlled by BLM. Another approximately 3,100 acres are controlled by SITLA and the Utah Division of Wildlife Resources. (*Id.*) Private individuals or entities own the remaining conservation area acreage. (*Id.*) Taken together, the conservation area acreage encompasses 64% of known Graham's beardtongues and 76% of known White River beardtongues. 79 Fed. Reg. at 46067.

Under the Conservation Agreement, designated conservation areas are not completely off-limits to development. Rather, on federal lands, the Conservation Agreement limits new surface disturbance to a maximum of 5% in Graham's beardtongue conservation units, and 2.5% in White River conservation units. (R. at 5032.)[2] On state and private lands, the

---

1. SITLA is a state agency responsible for managing the trust lands granted to Utah by Congress at Utah's statehood. (*See* ECF No. 36–1 ¶ 2.) Beardtongues exist on SITLA land. *See* 78 Fed. Reg. at 47607.

2. A "conservation unit" is a geographic subdivision of a conservation area. (R. at 5028.)

same limits apply "per landowner." (R. at 5033.) On both federal and non-federal lands, surface-disturbing activities may not take place within 300 feet of any beardtongue. (R. at 5032–33.) BLM will also enforce this 300–foot buffer on BLM lands that fall outside of any designated conservation area (R. at 5032)—something BLM had already been doing for some time. See 78 Fed. Reg. at 47607. Under the Conservation Agreement, however, the buffer can be breached if the "conservation team" determines that the particular activity "benefits or reduces impacts to the species or habitat." (R. at 5036.)

The conservation team is an organization with representatives from all signatories, to whom the signatories delegated authority to administer the Agreement, and which "will be organized within 6 months following the signature of this Agreement." (R. at 5032.) Apart from approving encroachments on the 300–foot buffer, the conservation team is charged with "develop[ing] criteria for the calculation of surface disturbance." (R. at 5036.)

As far as legal enforceability, the Conservation Agreement contains no system for the parties to require action of one another. However, the parties agreed to enact or implement appropriate legal or administrative measures within their own jurisdictions:

- "BLM will incorporate the provisions of this Agreement or the latest amendments to this Agreement into its Resource Management Plan ['RMP'] planning process, permitting requirements, agency planning documents and budgets. Within 3 months of the signature date of the Agreement, the BLM will incorporate the provisions of this plan into permits and budgets. During the next planning cycle, the BLM will incorporate the provisions of this Agreement into their RMP planning process." (R. at 5037.)
- "Uintah County will enact an ordinance with associated enforcement protocols and penalties that adopts the conservation measures in this Agreement ... within 3 months after the signing of this Agreement." (Id.)
- "SITLA will enact a regulation, order, or lease stipulation, as applicable, within 3 months of signing this Agreement ...." (R. at 5037–38.)

The Conservation Agreement states that funding of its activities is "not mandatory," but—apparently to support the notion that funding is fairly certain—lists the many activities already funded and accomplished by federal, state, local, and private entities (largely surveys and habitat inventories). (R. at 5048–49.) It also lists the monetary and in-kind contributions already committed by various signatories and non-signatories. (R. at 5049–50.)

The Conservation Agreement will expire after 15 years (i.e., in July 2029). (R. at 5052.) Significantly, it contains no provisions for renewal or extension, or even consideration of renewal or extension.[3]

### G. The 2014 Withdrawal Notice

On July 22, 2014—the same day as the Conservation Agreement's effective date—FWS issued a final decision regarding whether to list the beardtongues ("2014 Withdrawal Notice"). See 79 Fed. Reg. 46042.[4] "Based on our analyses of the po-

---

3. The Conservation Agreement can also terminate before the end of 15 years if FWS lists either beardtongue species as threatened or endangered, "whether through the current USFWS listing process or any renewed process directed by any judicial action." (Id.)

4. The decision was published in the Federal Register on August 6, 2014, but was dated July 22, 2014. See id. at 46087.

tential threats to the two species and the protections provided by the [Conservation Agreement]," FWS "determined that neither [the] Graham's nor White River beardtongue meets the definition of a threatened or endangered species." *Id.* at 46066. In other words, FWS found that the Conservation Agreement's protections mitigated the threats perceived the year earlier to a point where the beardtongues no longer faced a threat to their continued existence.

Part of this decision comprised a "PECE Analysis," *see id.* at 46073–74, referring to a policy promulgated in 2003 entitled "Policy for Evaluation of Conservation Efforts When Making Listing Decisions," 68 Fed. Reg. 15100, 15100 (Mar. 28, 2003). The purpose of the PECE is to guide evaluations of "formalized conservation efforts that have not yet been implemented or have been implemented, but have not yet demonstrated whether they are effective at the time of the listing decision." *Id.* at 15113. It establishes a number of criteria to evaluate both the likelihood that a formal conservation agreement will be implemented, and the likelihood that it will be effective. *Id.* at 15114–15. Regarding implementation, the PECE requires FWS to consider matters such as the likelihood of the parties maintaining necessary funding, the presence of an implementation schedule with precise deadlines, the parties' legal authority to enforce provisions of the agreement, and so forth. *Id.*

Applying the PECE criteria to the Conservation Agreement, FWS expressed a "high degree of certainty that the [Conservation Agreement's] measures will be implemented because the conservation team partners have a track record of implementing conservation measures for these species since 2007," referring to the actions prompted by the 2007 draft conservation agreement. 79 Fed. Reg. at 46073. FWS

also found that the Conservation Agreement's provisions for monitoring and reporting gave it additional certainty that the Conservation Agreement would be implemented. *Id.*

Given all this, FWS found that neither beardtongue was endangered or likely to become so, and therefore concluded that listing either one as an endangered or threatened species "is not warranted at this time." *Id.* at 46087.

## H. This Lawsuit

In March 2015, Plaintiffs filed this lawsuit against FWS, the Department of the Interior, and relevant administrators (collectively, "Federal Defendants"), challenging the 2014 Withdrawal Notice. (ECF No. 1.) The Court subsequently permitted the State of Utah, SITLA, and Uintah County (collectively, "Utah Defendants") to join the lawsuit as intervenor defendants. (ECF No. 20.) The Court has also accepted an *amicus* brief from the American Petroleum Institute. (*See* ECF Nos. 48, 49.)

## III. STANDING

■ Plaintiffs challenge FWS's 2014 Withdrawal Notice under the judicial review provisions of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706. Before the Court can conduct its review function, however, it must address the Utah Defendants' argument that Plaintiffs lack Article III standing to bring this challenge.

Plaintiffs argue that they have standing in the traditional manner for these sorts of cases, *i.e.*, declarations from members of their respective organizations who claim scientific, educational, aesthetic, recreational, and cultural value in being able to visit and view the beardtongues, and further claim that they have definite plans to make one or more such visits in the near future. (*See* ECF Nos. 46–1 through 46–4.)

Each of these declarations claims that the beardtongues' continuing viability is threatened by FWS's decision not to list those species, and would be remedied either by an order requiring FWS to reconsider, or by an affirmative listing decision that might flow from such reconsideration. (ECF No. 46–1 ¶ 17; ECF No. 46–2 ¶ 22; ECF No. 46–3 ¶ 14; ECF No. 46–4 ¶ 11.)

The Utah Defendants' counterargument is grounded in the ESA's comparatively limited protections for listed plant species. Unlike listed animal species, which are protected from being killed or captured essentially anywhere within the United States and its territorial waters, *see* 16 U.S.C. § 1538(a)(1), listed plant species are protected only in "areas under Federal jurisdiction" and in situations where a person acts in "knowing violation" of a state law (such as a law specifically protecting the species, or a general criminal trespass law), *id.* § 1538(a)(2)(B). In other words, to the extent a species is found on state or private land, its protection turns entirely on state law.

Here, about 50% of Graham's beardtongues are found on state and private land, and slightly less than 40% of White River beardtongues are found on state and private land. *See* 79 Fed. Reg. at 46045, 46049. Thus, if FWS chose to list the beardtongues, the ESA would provide comparatively limited and contingent protection to 50% of Graham's beardtongues and 40% of White River beardtongues.[5] By contrast, the Conservation Agreement applies on federal, state, and private land.

■ This is the crux of the Utah Defendants' standing argument. Article III standing requires three elements: (1) an injury in fact—an invasion of a legally protected interest which is (a) concrete

and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Utah Defendants argue that Plaintiffs can satisfy none of these elements, in particular the second and third, because Plaintiffs cannot establish that a decision to list the beardtongues is threatened or endangered would provide *better* protection than the Conservation Agreement. (ECF No. 50 at 24–42.)[6]

The Utah Defendants note, for example, that a listing decision may or may not lead to essentially the same protections already in place on federal land (*e.g.*, BLM's 300–foot buffers), but would certainly void the Conservation Agreement and therefore allow energy development to "proceed on state and private lands to a greater degree ... than allowed under the Conservation Agreement." (*Id.* at 41.) In short, the Conservation Agreement will protect 64% of Graham's beardtongues and 76% of White River beardtongues with a 300–foot buffer, among other measures; whereas under a decision to list, 50% of the Graham's beardtongues and 40% of the White River beardtongues could allegedly be bulldozed immediately. Thus, say the Utah Defendants, Plaintiffs cannot establish that their claimed harm is caused by the decision not

---

5. No party argues that Utah or Colorado has laws specifically protecting these species, so enforcement on state and private land would be limited to instances of criminal trespass.

6. All ECF page citations are to the page number in the ECF header, which may not match the document's internal pagination due to prefatory material such as a table of contents.

to list, or that the beardtongues would be better protected under a decision to list.

The Utah Defendants' argument makes an interesting practical point, but it goes to the merits of FWS's decisionmaking, not to standing. *See WildEarth Guardians v. EPA*, 759 F.3d 1196, 1207 (10th Cir. 2014) (plaintiff's potentially incorrect view of agency's duty "is a merits issue, not an issue for standing"). It is enough that Plaintiffs allege in good faith that they believe a listing decision would provide better protections than the Conservation Agreement.

Moreover, because this is an ESA case, Plaintiffs have standing by arguing that the ESA failed to follow appropriate procedures. *Id.* ("To show redressibility for an alleged procedural violation of the ESA, a plaintiff needs to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision." (internal quotation marks omitted; alterations incorporated)). Here, Plaintiffs allege that FWS made its decision not to list in violation of the ESA's directives regarding what may be properly considered in a listing decision. (*See, e.g.*, ECF No. 1 ¶¶ 5–6.) Plaintiffs accordingly have standing at least to allege this procedural injury. The Court rejects the Utah Defendants'. argument to the contrary, and therefore turns to its task of reviewing FWS's decision under the APA.

## IV. STANDARD OF REVIEW

Under the APA, this Court "shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision is considered arbitrary and capricious if the agency "(1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not· be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (internal quotation marks omitted). The Court's "inquiry under the APA must be thorough, but the standard of review is very deferential to the agency. A presumption of validity attaches to the agency action and the burden of proof rests with [the party raising the challenge]." *W. Watersheds Project v. BLM*, 721 F.3d 1264, 1273 (10th Cir. 2013) (internal quotation marks and citation omitted).

## V. APA ANALYSIS

### A. Status of Unimplemented, Unproven Conservation Agreements

A significant portion of the parties' dispute centers on the question of whether FWS· may rely on an unimplemented, unproven conservation agreement to determine that listing a species is not warranted. This argument principally concerns two portions of ESA § 4 (16 U.S.C. § 1533), specifically: § 4(a)(1)(D), which requires FWS to consider whether a species is threatened or endangered "because of * * * the inadequacy of existing regulatory mechanisms"; and § 4(b)(1)(A), which requires FWS to account for conservation efforts "being made" by states when deciding whether to list a species. Plaintiffs argue that these two statutory provisions prohibit FWS from accounting for untested conservation plans. (ECF No. 46 at 22–27.)

This District and others have endorsed Plaintiffs' argument, relying on either § 4(a)(1)(D) or § 4(b)(1)(A), or both. *Alaska v. Lubchenco*, 825 F.Supp.2d 209, 219 (D.D.C. 2011); *In re Polar Bear Endangered Species Act Listing & 4(d) Rule*

*Litig.*, 794 F.Supp.2d 65, 113 n.56 (D.D.C. 2011); *CNE*, 795 F.Supp.2d at 1209; *Ctr. For Biological Diversity v. Morgenweck*, 351 F.Supp.2d 1137, 1141 (D. Colo. 2004); *Fed'n of Fly Fishers v. Daley*, 131 F.Supp.2d 1158, 1164–66 (N.D. Cal. 2000); *Oregon Nat. Res. Council v. Daley*, 6 F.Supp.2d 1139, 1153–54 (D. Or. 1998) ("*ONRC*"); *Biodiversity Legal Found. v. Babbitt*, 943 F.Supp. 23, 26 (D.D.C. 1996). On the other hand, exercising its authority to interpret the ESA, FWS finds in the PECE that it may, consistent with the ESA, consider "those formalized conservation efforts that have not yet been implemented or have been implemented, but have not yet demonstrated whether they are effective at the time of the listing decision." 68 Fed. Reg. at 15113; *see also Defenders of Wildlife v. Jewell*, 70 F.Supp.3d 183, 196–98 & nn.19–24 (D.D.C. 2014) (distinguishing and partly disagreeing with *Lubchenco* and *Polar Bear*, in light of the PECE).

Although certain decisions have mentioned or indirectly analyzed the PECE (at least *Defenders of Wildlife*, *Lubchenco*, and *Polar Bear*), none has specifically been presented with an argument that the PECE is facially contrary to the ESA. Moreover, the arguments presented here require the Court to pause and consider whether Plaintiffs are bringing such a facial challenge.

### 1. Whether a *Chevron* Challenge is At Issue

The beginning point of this discussion is the recognition that the PECE meets the APA definition of a "rule." *See* 5 U.S.C. § 551(4) (defining "rule" to mean, among other things, "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"); *see also id.* § 701(b)(2) (incorporating § 551's definition of "rule" by cross-reference). The PECE is not published in the Code of Federal Regulations, but it was nonetheless adopted through a formal notice-and-comment process. *See* 68 Fed. Reg. 15100, 15101–10 (summarizing notice, and comments received in light of that notice); *see also* 16 U.S.C. § 1533(h) (directing ESA-enforcing agency to "publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively").

In a footnote, Plaintiffs argue that, "[t]o the extent that the PECE purports to authorize FWS to rely on future conservation measures that have not yet been implemented ... it is inconsistent with the ESA's plain language. *See infra* p. 19 [ECF page 25]." (ECF No. 46 at 12 n.3.) This appears to be a facial challenge to the PECE, but parties generally do not bury facial challenges to major administrative actions in a footnote. Also, the subordinate clause ("T o the extent that ...") implies that the PECE may have some other purpose than permitting FWS to rely on unimplemented or unproven conservation agreements, yet that is the only purpose the Court can discern. Nonetheless, the cross-referenced "p. 19" argues that "FWS cannot *apply* the PECE in a manner that is inconsistent with the ESA." (*Id.* at 25 (emphasis added).) This indeed suggests some sort of as-applied challenge—but Plaintiffs do not develop it beyond an argument that the PECE itself forbids reliance on promises of conservation action that are too speculative. (*Id.*)

Throughout their briefs, Plaintiffs cite various cases (such as the various district court decision cited above) that offer interpretations of the ESA arguably conflicting with the PECE. However, to the extent Plaintiffs really do seek a ruling that the PECE is inconsistent with the ESA, they never formally mount that attack. They never invoke, for example, the recognized two-step evaluation process established by

the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Nor do Plaintiffs ever directly analyze the PECE.

■ Normally, facial challenges to administrative action must be brought within six years of the final agency action. *See Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 (10th Cir. 2012) ("APA claims are generally covered by the six-year limitations period contained in 28 U.S.C. § 2401(a) [the generic statute of limitations for claims against the federal government]."). The PECE became final in 2003, so any such challenge is long overdue. However, the Government never argues as much. It instead responds with a one-paragraph argument for *Chevron* deference. (ECF No. 47 at 32.) Thus, the Government appears to have forfeited any claim of untimeliness.[7]

■ Given this stance, the Court construes Plaintiffs' argument as a claim, however abbreviated, that the PECE is invalid because it allegedly violates the plain language of ESA § 4(b)(1)(A) (16 U.S.C. § 1533(b)(1)(A)). To resolve this claim, the Court will apply the *Chevron* two-step evaluation framework. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43, 104 S.Ct. 2778. If the intent of Congress is not unambiguous, the Court must proceed to the second inquiry: "whether the agency's

answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

### 2. *Chevron* Step One: Unambiguous Congressional Intent

The Court turns to the first *Chevron* question: Does the ESA "directly speak to the precise question at issue," namely, whether FWS may account for new and unproven conservation agreements when deciding whether to list a species? Although not evaluated in a *Chevron* stance, many of the district court decisions cited in Part V.A, above, employ what is essentially a plain language canon of construction to conclude that ESA §§ 4(a)(1)(D) and/or 4(b)(1)(A)(s) prohibit(s) consideration of such agreements. The various analyses found in all of these decisions are rather brief. For the following reasons, the Court respectfully disagrees with those analyses.

#### a. *ESA § 4(a)(1)(D)*

■ The Court begins with § 4(a)(1)(D), which states that one of the reasons FWS may find a species to be threatened or endangered is "inadequacy of existing regulatory mechanisms." Various courts have interpreted "existing" to foreclose consideration of future conservation efforts. In other words, if "regulatory mechanisms" now in place are not enough to prevent the species' decline, FWS may not rely on expected future developments to avoid listing the species. *See, e.g., CNE*, 795 F.Supp.2d at 1209; *Biodiversity Legal Found.*, 943 F.Supp. at 26.

"Existing regulatory mechanisms" raises interesting questions regarding what quali-

---

7. No published Tenth Circuit decision has held § 2401(a)'s statute of limitations to be jurisdictional, and the Court finds that it is not. *See Wild Horse Observers Ass'n, Inc. v. Jewell*, 550 Fed.Appx. 638, 641 n.2 (10th Cir. 2013); *see also Barnes v. United States*, 776 F.3d 1134, 1147–48 (10th Cir. 2015) (strongly criticizing Tenth Circuit's previous holding that § 2401(b)'s six-month FTCA filing window is jurisdictional), *cert. denied*, —— U.S. ——, 136 S.Ct. 1155, 194 L.Ed.2d 174 (2016). Thus, the Government may forfeit a § 2401(a) argument.

fies as a "regulatory mechanism," and when such a mechanism is "existing." Those questions are significant and the Court will address them in Part V.B, below. For present purposes, the Court focuses on whether the word "existing" in § 4(a)(1)(D) forecloses consideration of future conservation efforts. The Court finds that it does not.

To understand why, § 4(a)(1)(D) must be placed in context. It is, of course, a subparagraph of ESA § 4(a)(1), which states that FWS must determine "whether any species is an endangered species or a threatened species because of any of" five factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) overutilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1). Reading all of these together, it becomes clear that factor (E) makes factors (A)–(D) essentially superfluous. Unless one entertains notions such as threats caused by extraterrestrials, "natural or manmade factors affecting its continued existence" encompasses every possible reason a species might be in danger, including every specific possibility mentioned in factors (A)–(D). *See* J.B. Ruhl, "Section 4 of the ESA: The Keystone of Species Protection Law," in *Endangered Species Act: Law, Policy, and Perspectives* 19, 19 (Donald C. Baur & W m. Robert Irvin eds., 2002) (ESA authorizes listing of "species that are threatened or endangered by virtually any natural or man-made factors affecting their continued existence").

In this light, the question posed by the ESA is whether a species is endangered ("in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6)) or threatened ("likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20)) for *any* reason. FWS cannot avoid asking itself whether the specific factors (A)–(D) apply, but these factors are not thereby transformed either into exclusive considerations or automatic listing triggers. The ultimate question remains, "Is the species 'threatened' or 'endangered' as those terms are defined in the ESA?"

Thus, even if "existing regulatory mechanisms" are not in place to prevent a species' decline, it does not follow that FWS must list the species—particularly when the "threatened" classification is the only classification genuinely at issue. FWS may find that no existing regulatory mechanism protects a particular species and yet it is nonetheless *not* "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). This could be so for a number of reasons. For example, FWS might find that the species is stable, despite the lack of regulatory measures designed to protect it. Or FWS might find that other natural or manmade barriers are protecting the species just as well as regulatory measures might (*e.g.,* the relevant terrain is so remote and inhospitable that there is no reasonable likelihood in the foreseeable future that humans will exploit it to the detriment of the species). And, as relevant here, FWS might find that a conservation agreement is in place and likely to be implemented in a manner that will prevent a species from slipping toward endangered status.

In sum, ESA § 4(a)(1)(D) requires FWS to consider the efficacy of existing regulatory mechanisms. It does not "unambiguously express[ ] [the] intent of Congress," *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778, to foreclose consideration of planned conservation efforts when evaluating whether a species meets the definition of threatened or endangered.

### b. *ESA § 4(b)(1)(A)*

█ The Court must now consider whether ESA § 4(b)(1)(A) supplies the unambiguous Congressional intent that § 4(a)(1)(D) lacks. The Court finds it helpful to repeat the entire subparagraph verbatim:

> [FWS] shall make determinations required by subsection (a)(1) of this section solely on the basis of the best scientific and commercial data available to [it] after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A). Plaintiffs make two plain language arguments in this regard, both focused on the clause beginning with "and after taking into account those efforts, if any, being made by any State ... to protect such species."

### i. "Efforts, If Any, Being Made"

Plaintiffs' first plain language argument is that "being made" necessarily precludes reliance on promises to engage in future activity. (ECF No. 46 at 12 n.3, 17–18; ECF No. 53 at 15–17.) *See also ONRC*, 6 F.Supp.2d at 1153. The Court finds that "being made" is not so precise or limiting as Plaintiffs claim. Plaintiffs do not explain, for example, how entering into the Conservation Agreement is not an "effort[ ] ... being made" for "protection of habitat," or is not at least an "other conservation practice[ ]."

What plaintiffs seem to be saying is that there must be some additional affirmative step toward protection, but that logic does not withstand scrutiny. Take, for example, a state or municipality that had both entered into the Conservation Agreement *and* enacted implementing regulations or ordinances. The efficacy of those measures would still rely on a *promise* by the state or local government of *future* enforcement. Plaintiffs have given the Court no reason to believe that FWS must disregard such promises to enforce, *i.e.*, that the only state or local efforts that qualify as "being made" are those with some track record of enforcement proceedings—a requirement which would absurdly exclude consideration of state-level efforts that successfully deter potential violators.

Plaintiffs' interpretation of "being made" could also lead to other absurd results. Consider, for example, wildlife bridges that many states have constructed across freeways. Is an already-constructed wildlife bridge an effort "being made," or one that already has been made? Under Plaintiffs' interpretation it would seem to be the latter, meaning that FWS—for no rational reason—is forbidden from considering the effect of wildlife bridges and similar completed projects, to the extent they are otherwise relevant in its "review of the status of the species." 16 U.S.C. § 1533(b)(1)(A).

One might argue, of course, that a wildlife bridge is a sort of ongoing conservation effort and therefore an effort "being made." But this only displays the semantic flexibility of "being made." Realistically, a completed wildlife bridge can only be considered an ongoing state conservation effort if the state commits (1) not to tear it

down, and (2) to repair it when it needs repairs. But these would be promises of future action, which Plaintiffs would exclude from FWS's consideration.

Further consider a wildlife bridge that has yet to be built, but the state has appropriated sufficient funds and established a construction schedule. Is this enough to qualify as an effort "being made"? If so, at what point did it cross the line from an irrelevant promise of future action into an effort "being made"—and where is that line found in the statute? If this is not an effort "being made," why is FWS precluded from considering a likely forthcoming wildlife bridge? Plaintiffs do not address these sorts of questions.

In short, "being made" is not a technical term that by its terms clearly excludes just-implemented conservation plans. Thus, at the *Chevron* Step One phase, it does not unambiguously prohibit FWS's reliance on a formal commitment to implement specified conservation measures.

### ii. "By Any State"

Plaintiffs' second plain language argument is that "taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species" limits FWS to considering *only* state and foreign conservation measures. In other words, it necessarily excludes existing *federal* conservation measures, except when those conservation measures qualify as a "regulatory mechanism" under § 4(a)(1)(D). (*See* ECF No. 46 at 26 n.11; ECF No. 53 at 13 n.4.) *See also ONRC*, 6 F.Supp.2d at 1155 (stating without further analysis that § 4(b)(1)(A) "specifically includes only efforts by states or foreign nations and therefore necessarily excludes other federal efforts"). Thus, Plaintiffs say, FWS at a minimum must disregard promises of future action by federal agencies.

The Court finds this argument strained. The purpose of ESA § 4(b)(1)(A) is to guide FWS's "review of the status of the species," and its statement about "taking into account those efforts, if any, being made by any State ... to protect such species" seems much more likely to have been intended as an explicit charge to FWS not to overlook or discount state and international efforts affecting the status of the species. In other words, this language promotes the values of federalism and international comity. To say that it was meant to *exclude* consideration of federal non-regulatory efforts makes little sense—legal, practical, or otherwise. It is not phrased in exclusionary terms, and only can be interpreted that way by applying the *expressio unius* maxim. Therefore, the plain language canon of construction does not obviously apply.

Moreover, the Court need not accept the plain meaning, assuming there is one, if it leads to patently absurd results. *See In re McGough*, 737 F.3d 1268, 1276 (10th Cir. 2013). No party or previous decision has offered—and the Court cannot imagine—any reason, much less a rational reason, why Congress would charge FWS to consider a state's conservation "efforts" (which need not rise to the level of "regulatory mechanisms") but ignore similar non-regulatory federal efforts (potentially including FWS's own efforts).

Accordingly, under the *Chevron* Step One analysis, the Court finds that ESA § 4(b)(1)(A) does not unambiguously exclude consideration of federal agencies' commitment to future action.

### 3. *Chevron* Step Two: Permissible Construction of the ESA

The Court now asks whether the PECE offers a "permissible construction" of the ESA. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. In summary, the PECE reasons as follows:

The five "because of" factors in ESA § 4(a)(1) "focus[ ] on impacts negatively affecting a species," but § 4(b)(1)(A) also requires accounting for conservation efforts. 68 Fed. Reg. at 15113. This means that FWS must "take into account any State or local laws, regulations, ordinances, programs, or other specific conservation measures that either positively or negatively affect the species' status." *Id.* The charge to consider "existing regulatory mechanisms" in § 4(a)(1)(D) "indicates that[,] overall[,] [FWS] might find existing regulatory mechanisms adequate to justify a determination not to list a species." *Id.* In addition, ESA § 4(b)(1)(A) requires "an assessment of the status of the species (i.e., is it in decline or at risk of decline and at what rate is the decline or risk of decline) .... This determination requires us to make a prediction about the future persistence of the species, including consideration of both future negative and positive effects of anticipated human actions." *Id.* Such an interpretation is supported by the definitions of "endangered" and "threatened," both of which "connote future condition[s]," thus "indicat[ing] that consideration of whether a species should be listed depends in part on identification and evaluation of future actions that will reduce or remove, as well as create or exacerbate, threats to the species." *Id.* Ultimately, "we [*i.e.*, FWS] construe Congress' intent, as reflected by the language of the [ESA], to require us to consider both current actions that affect a species' status and sufficiently certain future actions—either positive or negative—that affect a species' status." *Id.* at 15114.

The Court finds that this is a permissible construction of the statute. Indeed, the construction relies on something so obvious that it has perhaps escaped the analytical focus it deserves, *i.e.*, that the ESA requires FWS to predict the future. And FWS routinely makes such predictions. Just as one example, the 2013 proposal to list the beardtongues as threatened uses the word "likely" almost 80 times, and is otherwise (unsurprisingly) replete with predictive statements.

That document's discussion of wildfire threats is a good case study of the fact that predictions can be both negative and positive. *See* 78 Fed. Reg. 47590, 47604. FWS noted a recent wildfire that had affected a small portion of Graham's beardtongue habitat, but also recognized that "[f]ires do not occur frequently in Graham's beardtongue or White River beardtongue habitat." *Id.* Nonetheless, "fire frequency and intensity is likely to increase with increased invasive weeds and climate change." *Id.* Yet again, Graham's beardtongue is known to be able to re-sprout from its roots following "low-intensity burns." *Id.* Weighing all of this, FWS finally concluded: "We do not consider wildfire alone a threat to either species." *Id.*

To again state the obvious, this discussion plainly considers evidence that wildfire may *or may not* threaten the beardtongues' survival, and concludes that it does not. In other words, the ESA does not require FWS to always assume the worst. Nor does it require FWS to give more weight to evidence favoring a finding of threatened or endangered status. Rather, FWS must simply evaluate the relevant data to determine whether a species meets the statutory definition of endangered or threatened.

This is further illustrated, implicitly, by Judge Miller's previous order requiring FWS to reconsider its decision not to list the Graham's beardtongue as threatened. As summarized in Part II.D, above, FWS had justified that decision in part due to the unlikelihood that significant oil and gas development would take place in the foreseeable future. Judge Miller found this conclusion inadequately supported. *See* *CNE*, 795 F.Supp.2d at 1207–08. He there-

fore found that FWS had "failed to consider the best information available concerning the impact of energy development presently *and in the future.*" *Id.* at 1208 (emphasis added). Notably, however, Judge Miller did *not* hold that FWS was precluded from returning to its original prediction that future development was unlikely.

Put plainly, FWS is allowed to predict the likelihood of something happening *or not*, so long as its predictions are grounded in "the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Consequently, one would expect that FWS would be permitted to consider all information that a reasonable prognosticator would consider under the circumstances. And this is, in fact, the position FWS took in the PECE. It interpreted the ESA to "indicate[ ] that consideration of whether a species should be listed depends in part on identification and evaluation of future actions that will *reduce or remove*, as well as create or exacerbate, threats to the species." 68 Fed. Reg. at 15113 (emphasis added).

Looked at from a perspective more tailored to this case, FWS could reasonably conclude that it may account for evidence that an energy company will *not* drill in a certain location just as it can account for evidence that an energy company *will* drill in a certain location. How much weight FWS gives to such evidence is another matter, but nothing in the ESA requires FWS to ignore it altogether, and the PECE reasonably construes the ESA to require that FWS at least consider such evidence.

An agreement such as the Conservation Agreement is evidence that a species is protected as stated in the agreement, even though the agreement is new and untested. Thus, the Court rejects Plaintiffs' argument that FWS behaved arbitrarily and capriciously when it considered the Conservation Agreement in its 2014 Withdrawal Notice. The Court likewise rejects the Plaintiffs' argument that FWS unjustifiably predicted that the Conservation Agreement's measures would be carried out.[8]

## B. "Existing Regulatory Mechanisms"

Although FWS did not err when it considered the Conservation Agreement in its 2014 Withdrawal Notice, there is nonetheless a significant flaw in that decision. Understanding this flaw requires a second examination of ESA § 4(a)(1)(D)'s charge that FWS must consider whether a species is endangered or threatened because of "the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D).

In the PECE, FWS construed "regulatory mechanisms" as follows: "e.g., laws, regulations, ordinances." 68 Fed. Reg. at 15115. No party disputes this interpretation, and indeed, Plaintiffs rely upon it as part of their challenge. (ECF No. 46 at 27–28.) The Court therefore deems it agreed upon by all parties that "regulatory mechanisms" means laws, regulations, ordinances, and formal enactments of a similar legislative character.

---

**8.** Some decisions have found certain conservation agreements to be an invalid consideration because they were unenforceable—apparently meaning that there was no mechanism by which one party to the agreement could force another party to comply. *See Defenders of Wildlife v. Jewell*, 68 F.Supp.3d 193, 210 n.11 (D.D.C.2014); *ONRC*, 6 F.Supp.2d at 1155. The Conserva-

tion Agreement at issue here likewise does not appear to be enforceable as between the parties. Under the PECE, however, this would simply be another data point to consider when predicting whether threats to the species will or will not materialize. It is little different than predicting whether an energy company will exploit an oil and gas lease when nothing requires it to do so.

As for "existing," the Court has not been pointed to any explicit interpretation from FWS, in the PECE or otherwise. The Court therefore adopts what appears to be the appropriate construction in context, namely, regulatory mechanisms that are "on the books" and in force (as opposed to those that have been repealed, or whose effective date has not arrived).[9]

With these constructions in mind, the Court turns to FWS's 2013 Proposed Listing, which provides the comparison necessary to demonstrate the flaw in the 2014 Withdrawal Notice.

The 2013 Proposed Listing evaluates whether the beardtongues are threatened or endangered because of inadequate existing regulatory mechanisms. 78 Fed. Reg. at 47606–08. At the federal level, FWS noted, among other things, that the relevant BLM field office had adopted "conservation measures" directed at the beardtongues, principally including a 300–foot buffer between any beardtongue and all surface-disturbing activities (a measure that would eventually become part of the Conservation Agreement). *Id.* at 47606–07. FWS was unclear whether it considers such conservation measures to be "regulatory mechanisms." FWS did not state that BLM's conservation measures are embodied in any law, regulation, or ordinance. In any event, FWS went on to note that the 300–foot buffers "are sufficient to protect the species" if "current minimal levels of energy development" were to persist. *Id.* at 47607. However, as energy development increases, the buffer would not be enough to protect against indirect effects "such as

habitat fragmentation and pollinator disturbance." *Id.*

As for state and local governments, FWS noted that neither Utah nor Colorado had "laws or regulations [to] protect rare plant species." *Id.* Moreover, "SITLA, which manages most of the [Utah–owned] lands where Graham's beardtongue is found[,] ... has not required project proponents to protect Graham's beardtongue, White River beardtongue, or other rare or listed plant species on SIT LA–managed lands." *Id.* Finally, FWS was "not aware of any city or county ordinances or zoning that provide for protection or conservation of Graham's and White River beardtongues and their habitats." *Id.* FWS therefore concluded that "cohesive, landscape-level regulatory mechanisms" were needed. *Id.* at 47608.

FWS's 2014 Withdrawal Notice obviously announces a change of course in this regard, but it does so in a manner that is difficult to understand. In particular, FWS constantly mixes future and present tense, apparently in an awkward attempt to fit yet-to-be-enacted ordinances or regulations into the framework of "existing regulatory mechanisms." *See* 79 Fed. Reg. at 46083–84.[10] For example, FWS says that "SITLA *will establish*" the restrictions required by the Conservation Agreement "through a regulation, director's order, or joint lease stipulation. With these regulatory mechanisms in place[,] both beardtongue[ ] species *are afforded* some additional protection on State lands." *Id.* at 46084 (emphasis added). As for local regu-

---

**9.** The Court does not hold that "existing" must be construed this way (*i.e.*, that any other construction would fail the *Chevron* test). The Court has no reason to reach that question because FWS has not offered any clear construction of "existing."

**10.** FWS has nowhere argued that the Conservation Agreement might itself be considered

an "existing regulatory mechanism." Such an argument would be inconsistent with FWS's interpretation of "regulatory mechanisms" to mean laws, regulations, and ordinances, but the Court is not presented with the question of whether that definition might be reasonably extended to encompass a conservation agreement.

latory mechanisms, Uintah County *"will enact* a zoning ordinance" enforcing the Conservation Agreement's restrictions "on private lands. . . . The enactment of a zoning ordinance by Uintah County *provides* additional regulatory protections to a significant portion of both beardtongue populations on private lands." *Id.* (emphasis added).

FWS's discussion of federal efforts is less jarring, but no less problematic. When discussing BLM's obligations under the Conservation Agreement, FWS says that BLM "will implement the measures of the [Conservation Agreement] through incorporation of the conservation measures in permitting processes and policy. BLM will incorporate conservation measures during its next RMP planning process." *Id.* at 46083. FWS then states forthrightly that BLM's "existing *and future* conservation measures" will protect the beardtongues. *Id.* at 46084 (emphasis added).

▮ Having concluded in 2013 that regulatory mechanisms then in place were not sufficient, it was arbitrary and capricious for FWS to turn around in 2014 and claim that there was no longer a threat from inadequate regulatory mechanisms because still-to-come regulatory mechanisms were somehow already "existing." FWS's conflation of the two concepts is somewhat understandable from a practical point of view because it was up against the one-year deadline for making a final decision regarding the 2013 Proposed Listing. Thus, there likely was not time for the various government bodies to enact the promised regulations and ordinances. Nonetheless, this Court reviews an agen-

cy's decision "on the evidence and proceedings before the agency at the time it acted." *Am. Min. Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). At the time FWS issued its 2014 Withdrawal Notice, it could not say that the regulatory gaps identified in the 2013 Proposed Listing had been filled.[11]

Of course, *by now*, the various government bodies may have enacted the promised regulations, ordinances, and so forth. That is something the Court normally may not consider under the rule that review should be made on the record before the agency when it acted. Nonetheless, if this procedural blindness to the present state of affairs was the only problem with the 2014 Withdrawal Notice, the Court would be loathe to remand simply to make FWS issue a new decision based on the existence of ordinances now in place. Rather, the Court would at least have invited briefing on whether certain justifications for supplementing the record might apply in this situation. *See, e.g., Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1034 (10th Cir. 1976) ("After promulgation, events indicating the truth or falsity of agency predictions should not be ignored.").

However, the treatment of existing regulatory mechanisms is not the only problem with the 2014 Withdrawal Notice. There are additional problems, discussed next, that cannot be fixed simply by supplementing the record.

## C. 15–Year Term

As this Court has emphasized above, FWS's overriding purpose is to determine whether a species meets the ESA's defini-

---

11. Consistent with the Court's discussion in Part V.A.2.a, above, FWS conceivably could have instead reasoned that regulatory mechanisms remain the same as in 2013, but their inadequacy is no longer a potential cause of beardtongue decline because the Conservation Agreement ensures that the beardtongues will not decline and its measures are likely to be carried out. FWS did not offer this reasoning, however, and so the Court cannot review it. *Am. Min. Cong.*, 772 F.2d at 626 ("the agency's action must be reviewed on the basis articulated by the agency").

tion of "threatened" or "endangered." In both the 2013 Proposed Listing and the 2014 Withdrawal Notice, the only classification genuinely at issue was "threatened" status. "Threatened," again, means the species is "likely to become an endangered species *within the foreseeable future* throughout all or a significant portion of its range." 16 U.S.C. § 1532(20) (emphasis added).

■ Here, the Conservation Agreement lasts through 2029 and protects approximately 64% of known Graham's beardtongues and 76% of known White River beardtongues. 79 Fed. Reg. at 46067. Thus, by implication, FWS knows that approximately 36% of known Graham's beardtongues and 24% of known White River beardtongues are entirely unprotected through 2029 and could therefore be subject to the same destruction, directly or indirectly, that FWS deemed likely in the 2013 Proposed Listing. Moreover, FWS also knows that in 15 years, all of the Conservation Agreement's protections will go away on state and private land—leaving, at best, only BLM's protective measures on federal land.

The ESA does not define "foreseeable future," but in this case FWS has already demonstrated how much of the future it can foresee. It can at least predict the status of the species in 2029. Moreover, in the 2013 Proposed Listing, it predicted dire consequences for the species at least through 2033. 78 Fed. Reg. at 47609 ("threats are likely to occur in the future, within the next 20 years, at a high intensity and across both species' entire ranges"). Thus, by its own statements, FWS has effectively acknowledged that, by 2029, the beardtongues will be back in the same precarious state as they were in 2013. On this record alone, then, the beardtongues meet the definition of a threatened species, and FWS acted contrary to the ESA in concluding otherwise.

To be clear, the Court does not mean to imply that conservation agreements must have an indefinite duration. A conservation agreement may reasonably have a limited duration if FWS can explain, based on the best scientific and commercial data available, why the species would not warrant listing after the agreement's expiration.

No such explanation appears in this record, however. Instead, FWS assures only that the Conservation Agreement "can be renewed depending on [its] success ... and if signatories are willing." 79 Fed. Reg. at 46067. This is somewhat misleading, in that it implies some sort of renewal mechanism built into the Conservation Agreement itself. In fact, no such mechanism exists. Thus, FWS's explanation really ly says nothing more than, "Nothing stops the parties from coming to a new agreement."

FWS's further explanation also does not address the appropriate question. "After the 15–year period," FWS says, "we hope to better understand the intensity and timeframe of oil shale development, the species distribution within its range, as well as responses to livestock grazing so that any future conservation agreement can address those factors appropriately." *Id.* Better understanding in the future is laudable, but it is not a substitute for what FWS can currently predict. It does not explain how the Conservation Agreement's inevitable expiration in 15 years will not threaten the beardtongues.

The Court accordingly finds that FWS's 2014 Withdrawal Notice was arbitrary and capricious in that it failed to explain why the beardtongues would not be threatened in the foreseeable future, *i.e.*, when the Conservation Agreement expires.

### D. 300–Foot Buffers

In the critical habitat designation accompanying the 2013 Proposed Listing, FWS

declared that a buffer of 2,297 feet (700 meters) would be needed around Graham's beardtongue "occupied habitat" to "conserve the pollinators essential for plant reproduction." 78 Fed. Reg. 47832, 47836 (Aug. 6, 2013). For White River beardtongues, FWS proposed a buffer of 1,640 feet (500 meters). *Id.* at 47837.

Obviously the Conservation Agreement's 300–foot buffers are much smaller. The 2014 Withdrawal Notice explains this change in a confusing manner:

> The [300–foot] buffers were selected to protect the species from the effects of surface-disturbing activities because this is the buffer distance that is currently being used [when FWS is consulted about avoiding effects on plants in the region]. This buffer distance is based on a review of literature that shows that, although the effects of dust can extend out to 1,000 m (3,281 ft), and ground disturbance may have additional effects out to 2,000 m (6,562 ft), the greatest impacts occur closer to the disturbance. Thus, [300 feet] was selected to balance the protection of the species with energy development.

79 Fed. Reg. at 46061. It is not clear from this explanation whether 300–foot buffers were selected because FWS already had a track record with them, because they are sufficiently protective, or because of a horse trade with energy developers.

However, upon reading the "literature" referenced in this explanation, the reasoning becomes clearer. The relied-upon document is a March 2014 assessment of the effect of dust on plant species in the Uinta Basin generally, prepared by FWS, and it concludes as follows:

> A 300 ft (91 m) recommended buffer to conserve threatened and endangered plants in the Uinta Basin is a minimum protective distance based on available

studies. Many of these studies recommend a much wider buffer distance. Our 300 ft (91 m) buffer recommendation balances the protection of listed species with the need for energy development, but considerations for larger buffers should be considered in site specific locations or based on the status of plant species populations.

(R. at 25596.) In other words, FWS accepted a 300–foot buffer in the Conservation Agreement because its internal study identified it as the minimum needed distance, and selecting that minimum distance balances plant protection with energy development. For two reasons, this size of the buffer zone selection was improper.

■■■ First, it is "not in accordance with law." 5 U.S.C. § 706(2)(A). The already-much-discussed ESA § 4(b)(1)(A) states that FWS must make its listing determinations "solely on the basis of the best scientific and commercial data available." Congress added the word "solely" in 1982, explaining that the change was "intended to remove from the process of the listing or delisting of species any factor not related to the biological status of the species," and that "economic considerations have no relevance to determinations regarding the status of species." H.R. Conf. Rep. No. 97–567, 20, 1982 U.S.C.C.A.N. 2807, 2820. Thus, FWS may not balance the needs of energy developers when selecting a protective buffer.

■■■ Second, FWS failed to recognize that its internal recommendation was generic with respect to the plant species of the Uinta Basin. The recommendation contains no discussion of what buffer might be needed for the beardtongues specifically, and in fact emphasizes that "larger buffers should be considered ... based on the status of plant species populations." (R. at 25596.)

For these reasons, the Court agrees with Plaintiffs that the 300–foot buffer was

inappropriately selected and otherwise inadequately explained.[12]

### E. Scope of Conservation Areas

Plaintiffs also attack the difference between the size of the proposed critical habitat in 2013 compared to the size of the conservation areas in the Conservation Agreement. In 2013, FWS proposed 67,959 acres of critical habitat for Graham's beardtongue and 14,914 acres for White River beardtongue. *Id.* at 47840–41, 47843. Given that the two designations partially overlapped, FWS designated a combined total of 75,846 acres. 79 Fed. Reg. at 46061. The Conservation Agreement, by contrast, protects only 44,373 acres.

FWS explained this change by relying on the ESA's comparatively weak protections for listed plants on non-federal lands. (*See* Part III, *above*.) Whereas listing the beardtongues and designating their critical habitat would only guarantee protection on federal land, the Conservation Agreement applies with equal force on federal, state, and private land. 79 Fed. Reg. at 46061. Thus, according to FWS, the Conservation Agreement "conserves a smaller amount of habitat, but provides greater protection because it actually conserves a greater percentage of the population." *Id.*

Plaintiffs respond that FWS improperly downplays the ESA's protections for plants on non-federal lands. In particular, any state or private action that might require federal approval (*e.g.*, building a road across BLM land) would require the relevant federal agency to consult with FWS regarding the effect on the listed plant, potentially leading to denial of federal approval or restrictions on the approved activity. *See* 16 U.S.C. § 1536(a). Moreover, Plaintiffs point out that, before issuing the 2014 Withdrawal Notice, FWS identified ways in which predicted energy development projects would have a "[p]ossible Federal nexus," thus requiring federal agency consultation with FWS. (R. at 6021.) Thus, Plaintiffs say, FWS could not properly conclude that the Conservation Agreement would provide greater protection on diminished acreage.

Plaintiffs fail to note, however, that the same FWS document identifying the possible federal nexus for each project also stated, "W e anticipate that only a small number of activities on private and State lands will have a Federal nexus (e.g. federal funding or permits) resulting in a [FWS] consultation. We anticipate projects with a federal nexus on non-federal portions of these species' ranges will be related to energy development." (R. at 6016–17.) Thus, although energy projects were the most likely to have a federal nexus, the possibility was nonetheless "small." Plaintiffs offer nothing to challenge this prediction. Nor do Plaintiffs point to any evidence FWS ignored or improperly weighed when concluding that the reduced acreage in the Conservation Agreement nonetheless provided sufficient protection in light of the Conservation Agreement's scope.[13]

---

12. The Court does not hold that the 300–foot buffer could never be justified, only that FWS has not justified it on this record through appropriate considerations.

13. Plaintiffs also assert that the Conservation Agreement "places no limitations whatsoever on planned oil shale development within the beardtongue's habitat, leaving oil shale developers free to destroy the wildflowers." (ECF No. 46 at 31.) Plaintiffs appear to be saying that the conservation areas designated within the Conservation Agreement are areas where energy companies had no immediate plans to drill anyway, and therefore the Conservation Agreement does not protect any beardtongues that were not already likely to be destroyed. It is true that the Conservation Agreement does not protect beardtongues outside of the designated conservation areas, but that is a fundamental feature of the agreement. It does not,

However, it appears to the Court that the selection of acreage to include in the conservation areas was in part connected to the assumption of a 300–foot buffer around the beardtongues. (*See* ECF No. 47 at 50 n.14.) Because the 300–foot buffer cannot stand on this record, the Court finds it impossible to determine whether the amount of protected acreage is somehow independently adequate. The Court therefore makes no ruling on the size of the conservation areas specifically. To the extent that FWS, on remand, continues to pursue a strategy based in the Conservation Agreement, FWS should reconsider the adequacy of the protected acreage in light of whatever it determines to be an appropriate buffer.

**F. Surface Disturbance Caps**

Plaintiffs also claim FWS did not adequately explain or support its assertion that surface disturbance caps of 5% (for Graham's beardtongue) and 2.5% (for White River beardtongue) are sufficient to protect the two species. But this also appears to be inextricably linked to the 300–foot buffer, and to the amount of acreage included in the conservation areas. The Court therefore cannot evaluate the surface disturbance caps independently, and makes no ruling on them. As before, if FWS presses forward with an Agreement–based strategy on remand, FWS should reconsider the surface disturbance caps in light of whatever it concludes regarding the buffer and the amount of protected acreage.

**VI. MEET–AND–CONFER REQUIREMENT**

The Court will vacate the 2014 Withdrawal Notice and reinstate the 2013 Proposed Listing. However, before setting a schedule for a new final decision, and be-

fore entering final judgment, the Court will require counsel for the parties (and representatives of the parties themselves, to the extent appropriate) to meet and confer in person. At that meeting or meetings, the parties shall discuss in good faith whether the Conservation Agreement may be modified to a degree that Plaintiffs would accept as adequate to protect the beardtongues for the foreseeable future.

The Court will not set detailed requirements for these meeting(s). The Court trusts that counsel for all parties will work together professionally to set the precise date, time, location, and format of such meeting(s), and that they will ensure that the appropriate representatives attend. The Court will then require a joint status report no later than one week following their final meeting.

**VII. CONCLUSION**

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant Fish & Wildlife Service's withdrawal of its proposal to list the Graham's beardtongue and White River beardtongue as threatened, 79 Fed. Reg. 46042, is VACATED;

2. Defendant Fish & Wildlife Service's proposal to list the Graham's beardtongue and White River beardtongue as threatened, 78 Fed. Reg. 47590, and its designation of critical habitat in conjunction with that proposal, 78 Fed. Reg. 47832, are REINSTATED;

3. Defendant Fish & Wildlife Service's obligation to act on the reinstated proposal and critical habitat designation is STAYED pending entry of final judgment, which will not enter at this time;

of itself, demonstrate arbitrariness or capriciousness.

4. On or before **February 21, 2017,** counsel for all parties (including counsel for the Intervenor Defendants) are ORDERED to meet <u>in person</u> to discuss in good faith whether the Conservation Agreement may be modified such that Plaintiffs can agree that it will adequately protect the beardtongues for the foreseeable future. Non–attorney party representatives may likewise attend this meeting as appropriate. In addition, the parties may not refuse any reasonable request to attend from an attorney or non-attorney representative of the American Petroleum Institute or of any entity whose planned activities in the Uinta Basin would be adversely affected by a decision to list the Graham's beardtongue or White River beardtongue as threatened or endangered. The parties and counsel are free to meet as many times as in their judgment it will be necessary to comply with the letter and intent of this Order, provided only that said meeting or meetings are held no later than the February 21, 2017 deadline for same;

5. No later than **seven calendar days after the last of the foregoing meeting or meetings,** the parties shall file a joint status report describing the outcome of the meeting(s) and, if disputes remain, succinctly stating their respective positions.